*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0278p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

09-4339/ 4340/ 4341/ 4342/ 4344/ 4345

UNITED STATES OF AMERICA,

     *Plaintiff-Appellee/Cross-Appellant*,

     v.

MOHAMMAD AMAWI, MARWAN EL-HINDI, and WASSIM I. MAZLOUM,
     *Defendants-Appellants/Cross-Appellees*.

11-4079

UNITED STATES OF AMERICA,
     *Plaintiff-Appellee*,

     v.

MOHAMMAD AMAWI,
     *Defendant-Appellant*.

Nos.: 09-4339/ 4340/ 4341/ 4342/ 4344/ 4345; 11-4079

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:06-cr-719—James G. Carr, District Judge.

Argued: April 16, 2012

Decided and Filed:  August 23, 2012

Before:  BOGGS, MOORE, and CLAY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Amy B. Cleary, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, Stephen D. Hartman, KERGER & HARTMAN, LLC, Toledo, Ohio, David L. Doughten, Cleveland, Ohio, for Appellants/Cross-Appellees. John F. De Pue, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Thomas E. Getz, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee/Cross-Appellant.  Edward G. Bryan, OFFICE OF THE FEDERAL PUBLIC DEFENDER,

Cleveland, Ohio, for Appellant in 11-4079.  Justin E. Herdman, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee in 11-4079. **ON BRIEF:** Amy B. Cleary, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, Stephen D. Hartman, KERGER & HARTMAN, LLC, Toledo, Ohio, Charles M. Boss, BOSS & VITOU, Maumee, Ohio, Deborah K. Rump, Canton, Ohio, David L. Doughten, Cleveland, Ohio, Jeffrey J. Helmick, Toledo, Ohio, for Appellants/Cross-Appellees. John F. De Pue, Paul Ahern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Thomas E. Getz, Justin E. Herdman, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee/Cross-Appellant.  Edward G. Bryan, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, Melissa M. Salinas, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Toledo, Ohio, for Appellant in 11-4079. Justin E. Herdman, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, Thomas E. Getz, John F. De Pue, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee in 11-4079.

BOGGS, J., delivered the opinion of the court, in which CLAY, J., joined and MOORE, J., concurred in the judgment.  MOORE, J. (pp. 42–63) delivered a separate concurring opinion.

—————————

**OPINION**

—————————

BOGGS, Circuit Judge.  This appeal arises from a jury trial in which the three defendants were convicted of conspiracy to kill and maim persons outside the United States, in violation of 18 U.S.C. § 956(a)(1), and of conspiracy to provide material support to terrorists in furtherance of the killing of U.S. nationals, in violation of 18 U.S.C. § 2339A.  In addition, Amawi and El-Hindi were each convicted of two counts of distributing information regarding the manufacture of explosives, destructive devices, and weapons of mass destruction, in violation of 18 U.S.C. § 842(p)(2)(A).  Amawi, El-Hindi, and Mazloum were sentenced to below-Guidelines-range terms of 240, 144, and 100 of months of imprisonment, respectively.

There are ten issues on appeal.  First, the defendants challenge the district court's decision, pursuant to the Classified Information Procedures Act and Foreign Intelligence Surveillance Act, to delete classified information from discovery.  Second, the defendants challenge the sufficiency of the evidence underlying their convictions.  Third,

the defendants object that their expert witnesses—who would have testified about Islamist culture and social norms in the Middle East—should not have been excluded from testifying. Fourth, Amawi appeals the district court's denial of his motion to delay the trial. Fifth, the defendants challenge the district court's decision not to provide their requested jury instruction concerning the First Amendment. Sixth, El-Hindi appeals the district court's denial of his motion for acquittal as a matter of law based on an entrapment defense. Seventh, Mazloum appeals the district court's denial of his motion to dismiss the indictment against him based on an outrageous-conduct defense. Eighth, Amawi claims that his *Miranda* rights were violated after his arrest in Jordan while he was being interrogated onboard a jet flying back to the United States. Ninth, the government cross-appeals the sentences imposed, contending that they are both procedurally and substantively unreasonable. Tenth, Amawi appeals the district court's denial of his motion for a new trial based on allegations of newly discovered evidence regarding the alleged identity of a Syrian contact.

We affirm all opinions and judgments of the district court.

## I. Facts

This case concerns the actions of defendants Mohammad Amawi, Marwan El-Hindi, and Wassim Mazloum in connection with Darren Griffin, a paid informant for the FBI. After the attacks of September 11, 2001, the FBI assigned Griffin to embed himself in the Muslim community in Toledo, Ohio. Griffin enrolled in classes at a local mosque and obtained employment with a Muslim charity. Griffin described himself as an "ex-Green Beret, disenchanted with the United States[, who] did not agree with [American] foreign policy."

Griffin's contact with El-Hindi began in September 2002. El-Hindi approached Griffin after meeting him at a mosque and asked about the feasibility of kidnaping an Israeli soldier or politician. Over the next two years, Griffin developed a relationship with El-Hindi. Griffin expressed an interest in training others for "jihad" and said he would create a security company as a front. In June 2004, El-Hindi informed Griffin that he had wanted Griffin to train him and "two recruits" (Khaleel Ahmed and his cousin,

Zubair Ahmed) as "Islamic extremists for jihad."  Griffin spoke with the Ahmeds by phone, but the training never materialized.

Griffin first encountered Amawi at the same mosque where he met El-Hindi.  On June 30, 2004, Griffin went to Amawi's home.  Griffin stated that he wanted to fight for jihad against American forces in Iraq.  Amawi also expressed a desire to fight with the jihadists and martyr himself, though he said the "conditions for jihad" were not right in Iraq.  On October 14, 2004, the pair again met at Amawi's home.  Griffin showed Amawi various videos concerning fundamentalist Islamist terrorism, Usama Bin Laden, and the attacks on the Pentagon and the World Trade Center.

On October 21, 2004, Amawi suggested to Griffin the possibility of recruiting Mazloum for jihad training.  Amawi arranged a meeting with Mazloum and Griffin on October 24, 2004.  At this meeting, Mazloum agreed to participate in Griffin's planned jihad training—including bomb-making, weapons training, and certain paramilitary tactics.  On November 17, 2004, Amawi brought Mazloum to Griffin's apartment.

On November 23, 2004, and December 13, 2004, Griffin visited Amawi's apartment, where the two watched jihadist videos.  Amawi expressed admiration for a sniper in a video who claimed to have killed two Americans.  On January 10, 2005, Griffin and Amawi watched more jihadist videos at Amawi's home, including a video demonstrating how to construct a bomb vest.  On January 20, 2005, Griffin offered to provide Amawi with firearm instructions after Amawi indicated that he declined an opportunity to travel to Iraq due to his lack of training.  The next day the pair met at a shooting range, where Griffin trained Amawi in the use of handguns.  Amawi and Griffin met several times between January 27 and January 30, 2005.  Griffin suggested that they provide laptops to "brothers" in Iraq, and Amawi agreed to transfer jihadist materials that Amawi had obtained onto CDs to provide instruction to the jihadists.

On February 2, 2005, Griffin brought El-Hindi to Amawi's apartment. This was the first time Amawi and El-Hindi met.  The trio watched jihadist videos.  El-Hindi, watching a video about explosives, stated that "we will work with some of that stuff" and asked Amawi for a copy of the videos.  On February 6, 2005, Griffin met Amawi at

Amawi's apartment and asked him to transfer jihadist videos to Griffin, including the video about building a bomb vest. On February 8, 2005, Griffin met El-Hindi at his home. El-Hindi showed Griffin where he could download jihadist videos from the internet.

On February 14, 2005, El-Hindi and Griffin met Amawi at his office at AZ Travel. After Griffin suggested that they recruit other "brothers" for training, Amawi suggested that they recruit Wassim Mazloum and Mazloum's brother. On February 16, 2005, Griffin met Mazloum at Amawi's apartment, and the trio traveled to El-Hindi's home. This was the first and only time that all four were present together. After they all arrived, Griffin explained that he would train them but that they would have to pretend to be working for his security firm. Mazloum stated that he was ready for jihad training and expressed an interest in going to Iraq. Amawi suggested he knew another person who could be recruited and expressed an interest in going to Jordan or Iraq. El-Hindi offered to seek grants to fund the operation. The quartet agreed to begin training regardless of whether others could be recruited. El-Hindi sought sniper training. Mazloum said that he wanted to learn how to make bombs. Amawi thought it was important to learn how to make explosives and sought sniper training. Griffin offered to start with handgun training and stated that it was not practical to begin with explosives. The group then watched a series of jihadist videos. The four never met together after this meeting.

On February 18, 2005, El-Hindi gave Griffin an email from "Just Jeans," a company El-Hindi thought was a cover for a jihadist website. One week later, on February 26, 2005, El-Hindi and Griffin met again at El-Hindi's home. El-Hindi showed Griffin photos of the placement of a battery-detonated improvised explosive device ("IED") used to destroy U.S. military vehicles.

On March 14, 2005, Griffin and Amawi met at AZ Travel, and Amawi said that he was anxious to travel to Jordan—his lack of training was the only reason holding him back and preventing him from joining the jihad immediately.

Griffin met with El-Hindi on March 20, 2005. El-Hindi stated that he was preparing a grant to obtain funding for their training. The pair met with Jihadi Dahabi, an accountant, on April 4, 2005, to prepare fraudulent "educational" grants that would be used to finance jihad training.

On April 7, 2005, Amawi told Griffin that someone in "Syria" wanted to know if they could supply a "chemical thing" for the "brothers." Griffin figured out that the chemical in question was Astrolite, an explosive. Griffin offered to send laptop computers he had to Syria to help the brothers fighting in Iraq. On April 11, 2005, Griffin told Amawi that he had an Astrolite supplier in Kuwait. On April 13, 2005, Amawi and Mazloum met at Griffin's home. Griffin showed them how to properly align the sight on a pistol. Griffin explained the course of training he would provide. Amawi expressed an interest in learning how to manufacture IEDs. Amawi and Griffin decided that Amawi's contact in Syria should deal directly with Griffin's contact in Kuwait regarding the Astrolite. The next day, after Griffin expressed concern over discussing the Astrolite in front of Mazloum, Amawi said that Mazloum could be trusted.

On April 20, 2005, Griffin took Amawi and Mazloum to a shooting range. During the trip, Amawi again asked about IED training. Mazloum and his brother again joined Griffin and Amawi at the shooting range on April 29, 2005. Mazloum and Amawi again asked about explosive training. On May 1, 2005, Amawi told Griffin that he believed he was being followed. The next day Amawi, Griffin, and Mazloum purchased paintball equipment for tactical training.

On May 18, 2005, Amawi told Griffin that he intended to go to Jordan. On July 27, 2005, Griffin told Amawi that he had to travel to the Middle East for business and offered to buy Amawi a ticket. Amawi accepted the offer. The pair met again on August 15, 2005, to finalize plans for the trip. They sought to provide laptops loaded with videos for jihadists going to Iraq.

On August 22, 2005, Griffin and Amawi traveled to Jordan, carrying six computers and a satellite phone that the FBI gave to Griffin. While in Jordan, the pair stayed with Amawi's family. Amawi introduced Griffin to several of his "trusted

brothers." Griffin departed alone for the United States on September 8, 2005, leaving the satellite phone and one of the laptops. After his return, Mazloum asked Griffin whether he and Amawi had made "connections" with the "brothers, the mujahideen in Iraq."

On December 13, 2005, Griffin returned to Jordan, bringing, at Amawi's request, Amawi's desktop computer and three CDs containing jihad training videos. Griffin stayed with Amawi's family. Griffin departed alone on December 26, 2005. Upon Griffin's return, Mazloum again asked him, on January 30, 2006, whether he had made any connections with the "brothers over in Iraq" on his trip.

On February 17, 2006, the FBI contacted Griffin and told him to leave his apartment at once. His service as an informant was terminated, and his identity would soon become publicly known. On February 19, 2006, FBI agents flew to Jordan and arrested Amawi. The agents placed him on a jet. During the flight, Amawi was interrogated and made inculpatory statements.

## II. Classified Proceedings

The United States's case-in-chief presented to the jury did not contain any classified information. Thus, this court's review—with respect to the sufficiency of evidence supporting the conviction, the admissibility of expert testimony, the denial of a motion for a continuance, claims of entrapment and outrageous conduct, the violation of Amawi's *Miranda* rights, the sentences, and Amawi's motion for a new trial—is based entirely on the unclassified record. However, the defendants raise several arguments with respect to information that the district court examined and withheld from discovery under the Classified Information Procedures Act and the Foreign Intelligence Surveillance Act. Further, Amawi, Mazloum, and El-Hindi contend that the district court judge erred by conducting ex parte proceedings with the United States—both before and during the trial. Finally, defense counsel fault the United States for failing to process their security clearance applications. Following our review of the entire classified record, we find that the defendants' claims are without merit.

**A. The Classified Information Procedures Act**

The Classified Information Procedures Act (CIPA), 18 U.S.C. App. 3, provides a set of procedures for federal courts to follow when the government seeks to protect classified information from disclosure. The sections of CIPA are arranged in sequence based on the flow of litigation. Initially, section 2 provides that after the filing of the indictment, the government may move for a pretrial conference to "consider matters relating to classified information that may arise in connection with the prosecution." 18 U.S.C. App. 3 § 2. Next, under section 3, "[u]pon motion of the United States, the court shall issue an order to protect against the disclosure of any classified information disclosed by the United States." 18 U.S.C. App. 3 § 3. Section 4 governs what classified information can be protected by the United States from discovery:

> The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove. The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone. If the court enters an order granting relief following such an ex parte showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

18 U.S.C. App. 3 § 4. Section 5—which is not at issue in this case—provides the process if the "defendant reasonably expects to disclose or to cause the disclosure of classified information." Section 6 of CIPA provides procedures for cases that involve classified information:

> Within the time specified by the court for the filing of a motion under this section, the United States may request the court to conduct a hearing to make all determinations concerning the use, relevance, or admissibility of classified information that would otherwise be made during the trial or pretrial proceeding. Upon such a request, the court shall conduct such a hearing. Any hearing held pursuant to this subsection (or any portion of such hearing specified in the request of the Attorney General) shall be

held in camera if the Attorney General certifies to the court in such petition that a public proceeding may result in the disclosure of classified information. As to each item of classified information, the court shall set forth in writing the basis for its determination. Where the United States' motion under this subsection is filed prior to the trial or pretrial proceeding, the court shall rule prior to the commencement of the relevant proceeding.

18 U.S.C. App. 3 § 6.

On March 23, 2006, the United States moved for a protective order under section 3 of CIPA, and the district court entered an order on July 17, 2006. On September 14, 2007, the United States filed a notice of intent to use information derived under the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. § 1806. Relying on the authority of section 6, the district court conducted a series of ex parte hearings with the United States for purposes of reviewing the classified documents and considering the government's claims under CIPA and FISA. The district court also conducted ex parte hearings with defense counsel to learn about their defense theories and how any classified information might be helpful or necessary to the defense. On May 15, 2009, in denying a motion for a new trial, the district court held that it had conducted the ex parte hearings in conformance with CIPA and FISA.

**B. Deleting Evidence From Discovery Under CIPA**

**1. Precedents**

The leading case construing whether courts can permit the government to withhold evidence from discovery under CIPA § 4 is *United States v. Yunis*, 867 F.2d 617 (D.C. Cir. 1989). There, the District of Columbia Circuit held that evidence that "is relevant and helpful to the defense" cannot be withheld. *Id.* at 622 (quoting *Roviaro v. United States*, 353 U.S. 53 (1957) (internal quotation marks omitted)). The court looked to three factors to determine whether classified information should be disclosed. First, the court must assess whether the information "crosse[s] the low hurdle of relevance." *Id.* at 623. Second, the court must determine whether "the assertion of privilege by the government is at least a colorable one." *Ibid.* Third, because "classified information is

not discoverable on a mere showing of theoretical relevance . . . [,] the threshold for discovery *in this context* further requires that [the information] . . . is at least '*helpful to the defense of [the] accused*.'" *Ibid.* (quoting *Roviaro*, 353 U.S. at 60–61) (emphases added).

The "relevant and helpful" standard was adopted by several other circuits in ensuing cases. *See, e.g.*, *United States v. Aref*, 533 F.3d 72, 79–80 (2d Cir. 2008); *United States v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004); *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998); *United States v. Varca*, 896 F.2d 900, 905 (5th Cir. 1990); *United States v. Smith*, 780 F.2d 1102, 1107 (4th Cir. 1985).

Quite recently, in *United States v. Hanna*, 661 F.3d 271, 295 (6th Cir. 2011), we joined those circuits. In accordance with that holding and the other courts that have considered this issue, we now apply the *Yunis* "relevant and helpful" standard.

**2. Standard of Review**

The defendants and the United States disagree about the appropriate standard of review. They both agree that this court's review of whether the district court *can* conduct ex parte hearings is a question of law reviewed *de novo*. *See United States v. Dumeisi*, 424 F.3d 566, 578 (7th Cir. 2005). However, they disagree with respect to the appropriate standard of review of the district court's decision to delete certain classified items from discovery.

The United States contends that this court should review only for abuse of discretion. Defendants counter that the district court's CIPA rulings should be reviewed *de novo* because the district court articulated two different rationales to exclude the classified evidence—the *Brady v. Maryland* standard, and the general *Yunis* standard. The defendants assert that the district court erred by incorrectly applying the general standard for disclosure under *Brady* rather than the stricter standard for withholding classified information set out in *Yunis*. Under *Brady*, "the suppression by the prosecution of evidence *favorable* to an accused upon request violates due process where

the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (emphasis added).

These are two separate inquiries. First, to the extent that the district court applied an incorrect legal standard (*Brady*—which is less favorable to the defendant—rather than *Yunis*), then *de novo* would be the appropriate standard of review to ascertain an error in law. Second, beyond the application of the appropriate legal standard, this court reviews for an abuse of discretion the district court's decision to delete evidence from discovery based on the *Yunis* "relevant and helpful" standard.

### 3. Section 4 Analysis

The district court, at several junctures, interchangeably applied the *Brady* and the *Yunis* standard. *Cf. United States v. Meija*, 448 F.3d 436, 456 (D.C. Cir. 2006) ("We have conducted our review de novo because the district court did not determine whether the classified material would be helpful to the defendants under the *Yunis I* standard, but rather stated only that it was not subject to disclosure under *Brady v. Maryland*."). For example, during a pretrial conference on December 17, 2007, counsel for El-Hindi asked the court: "The FISA and CIPA information, Judge, we were talking about if there were any parts of that that were exculpatory, that was going to be reviewed by the Court. And has the Court reviewed that material?" The court answered, "I can only say what I've said. The government understands its obligation to ascertain and produce *exculpatory* material." This answer alludes to *Brady* and not *Yunis*, though the question by counsel was couched in terms of exculpation only. In an order denying defendants' requests to review CIPA and FISA materials, the district court stated that after its review, the classified record revealed that "[t]here was nothing exculpatory; nothing, indeed, that would have been at all helpful to the defendant or his attorneys." The former "exculpatory" standard related to *Brady*, and the latter "helpful" standard related to *Yunis*. This order had no citations to *Yunis*, but the alternative phrasing was squarely in line with *Yunis*.

The "favorable" materiality standard of *Brady* is much more difficult to satisfy than the "relevant and helpful" standard of *Yunis*. All *Brady* evidence that is "favorable" would be "relevant and helpful" under *Yunis*, but not all evidence that is "relevant and helpful" would be favorable. "To be helpful or material to the defense, evidence *need not rise to the level that would trigger the Government's obligation under Brady v. Maryland.*" *United States v. Aref*, 533 F.3d 72, 80 (2nd Cir. 2008) (emphasis added); *see Mejia*, 448 F.3d at 456–57 ("While *Brady* information is plainly subsumed within the larger category of information that is 'at least helpful' to the defendant, information can be helpful without being 'favorable' in the *Brady* sense."). Simply stated, evidence that needs to be disclosed under *Brady* would also need to be disclosed under *Yunis*, but not the other way around. Even assuming that the district court improperly applied the *Brady*, rather than the *Yunis*, standard, under *de novo* review, we find that this error is harmless.

When reviewing a district court's decision to withhold information under CIPA, this court is placed in a somewhat unfamiliar posture. Rather than neutrally deciding disputes with an open record based on the adversarial process, we must place ourselves in the shoes of defense counsel, the very ones that cannot see the classified record, and act with a view to their interests. *Meija*, 448 F.3d at 458 ("[T]he defendants and their counsel, who are in the best position to know whether information would be helpful to their defense, are disadvantaged by not being permitted to see the information—and thus to assist the court in its assessment of the information's helpfulness."). Acting as if we were in essence standby counsel for the defendants, we must determine what may be "relevant and helpful" to them. This is not a position that we relish, yet it is required by CIPA, as interpreted by *Yunis* and its progeny. And, after a review of the entire record with respect to the claims concerning classified information by the defendants, we find that there was nothing "relevant and helpful to the defense." *Yunis*, 867 F.2d at 623. We can take the first two *Yunis* factors as satisfied—the information is relevant, and the government's claim of privilege is colorable. However, the third factor is not satisfied. Similar to the record in *Meija*, we "conclude that [the classified evidence] 'falls far short' of the 'helpful or beneficial character' necessary to meet the threshold showing

for overcoming the privilege." *Meija*, 448 F.3d at 456. Defendants' claim with respect to section 4 of CIPA is without merit.

## C. Ex Parte Hearings Before and During Trial

Defendants object to the government's having met ex parte with the trial judge over two dozen times before and during the trial. Defendants are correct that section 4 of CIPA does not explicitly provide for ex parte hearings. Section 4 states: "The court may permit the United States to make a request for such authorization in the form of a *written statement* to be inspected by the court alone." 18 U.S.C. App. 3 § 4 (emphasis added).

However, every court that has considered this issue has held that CIPA permits ex parte hearings. While section 4 does not expressly provide for ex parte hearings, "[i]n a case involving classified documents, . . . *ex parte*, *in camera* hearings in which government counsel participates to the exclusion of defense counsel are part of the process that the district court may use in order to decide the relevancy of the information." *Klimavicius-Viloria*, 144 F.3d at 1261; *see United States v. Campa*, 529 F.3d 980, 995 (11th Cir. 2008) (observing that "[t]he right that section four confers on the government [to seek deletion or substitution] would be illusory if defense counsel were allowed to participate in section four proceedings because defense counsel would be able to see the information that the government asks the district court to keep from defense counsel's view"). We agree. Further, though section 4 does not directly mention ex parte hearings, section 6 does: "Within the time specified by the court for the filing of a motion under this section, the United States may request the court to conduct a hearing" that would be held in camera.

The purpose of CIPA is to provide a means for the courts to oversee the government's authority to delete evidence from discovery. To permit defense counsel to participate in such a hearing would frustrate the aim of CIPA. To the extent that the defendants are asserting that the government is limited to written submissions and affidavits to be considered in camera, rather than an ex parte hearing, such an argument would raise form over function, to the detriment of the defense. The district court's role

in determining whether any classified information is "relevant and helpful" could only be aided—for the benefit of the defense—through the court asking probing questions of the government, rather than relying only on written submissions.  Limiting the district court to written submissions would unnecessarily hamper this vital function of the district court in CIPA proceedings.[1]  We should stress that the district court also held ex parte hearings with defense counsel in order to learn about their theories and prepare for ex parte hearings with the government.

Defendants object, more specifically, to the fact that a number of ex parte hearings were conducted *during* the trial.  Section 6 of CIPA provides that "Where the United States' motion under this subsection is filed prior to the trial or pretrial proceeding, the court shall rule *prior to the commencement of the relevant proceeding*."  However, based on our review of the classified record and the sealed transcripts of these ex parte hearings, we agree with the government that the purpose of these ex parte hearings during trial was "simply to remind the district court of the terms of its prior rulings under CIPA concerning the disclosure of classified information, and to alert it to the fact that certain areas of cross-examination could implicate such rulings." United States Br. at 84 n.14.  We also note that the district court did not issue any rulings or orders in court based on these ex parte hearings.  Defendants' claims with respect to ex parte hearings are without merit.

**D. Security Clearances**

Defense counsel assert that, though they submitted security clearance applications well before trial, the government never processed their applications.  By failing to process the applications, defendants assert, the government was able to ensure an ex parte audience with the district court, thereby denying the defense an opportunity

---

[1]This conclusion is further supported by Federal Rule of Criminal Procedure 16(d), which grants the district court "broad authority . . . to regulate discovery[,] includ[ing] the power to hold hearings." *United States v. Campa*, 529 F.3d 980, 995 (11th Cir. 2008) (citing Fed. R. Crim. P. 16(d)). CIPA does not purport to limit this authority.  *Ibid*.  Because CIPA also expressly excludes defendants from proceedings addressing the discoverability of confidential information, logic dictates that a district court not only has the authority to hold a hearing for this purpose, but also the ability to do so ex parte.  *Ibid*.; *see also Aref*, 533 F.3d at 81; *Klimavicius-Viloria*, 144 F.3d at 1261.

to participate in the CIPA process.  Defendants are mistaken.  Even if counsel had been cleared, under the provisions of CIPA, they still would not have been able to participate in the classified discovery process and ex parte hearings.

The possession of a security clearance only becomes relevant *after* the district court determines, in accordance with section 4, that any classified information is discoverable.  "If . . . the Court decides that the information is not discoverable at all, Defendant is not entitled to production of the information, regardless whether his counsel is willing to submit to security clearance procedures."  *United States v. Abu Jihaad*, No. 3:07-CR-57, 2007 WL 2972623, at *2 (D. Conn. Oct. 11, 2007).

Because there was no classified information deemed discoverable, a clearance would not have entitled the defense to see any of the information.  In hindsight, it is rather easy for us to review the record and find that because the district court correctly decided that no classified information should be discoverable under section 4, the decision of the government to decline to process defense counsel's security-clearance applications created no error.  However, if the district court *had* determined that some classified information was discoverable at some late junction in the proceedings, then security clearances would have become urgently necessary, and the government would have needed, on an expedited basis, to process the clearances.  In such a case, a government decision not to process clearances at all could result in delays in the trial or affect the ability of defense counsel to represent their clients.  The decision to never even bother processing the clearances could rest on an inappropriate sense of predetermination of what the district court would do.  Simply processing the applications early on—whether they are ever used or not—and holding the final grant of clearance in abeyance pending the court's determinations, would not make the government susceptible to "graymail."**²**  As the government states numerous times, a clearance by

---

**²** *Tenent v. Doe*, 544 U.S. 1, 11 (2005) ("Forcing the Government to litigate these claims would also make it vulnerable to 'graymail,' i.e., individual lawsuits brought to induce the CIA to settle a case (or prevent its filing) out of fear that any effort to litigate the action would reveal classified information that may undermine ongoing covert operations.  And requiring the Government to invoke the privilege on a case-by-case basis risks the perception that it is either confirming or denying relationships with individual plaintiffs.").  "Our role [on] appeal is circumscribed.  We are not asked, and we have no authority, to consider judgments made by the Attorney General concerning the extent to which the

itself does not entitle defense counsel to view any documents.  If the district court determines that no evidence is discoverable under section four, the clearances would not be used.  If the district court determines that evidence is discoverable under section four, then the final clearance could be issued, and cleared counsel could timely review the documents to prepare a defense.

However, in this case, we agree with the district court that "[w]ith or without [any later-obtained] clearances, [defense counsel] could not have participated in the ex parte proceedings regarding classified information.  Nothing in CIPA opens the door to such proceedings simply because a defendant's attorney has been cleared to see classified information."  Because no classified information was deemed discoverable under section four, a security clearance would not have entitled defense counsel to any information.  This claim is without merit.

## E.  Foreign Intelligence Surveillance Act

 Though the government stated that it would not introduce any FISA-derived evidence at trial, the defense filed a motion to compel disclosure of such information. The government stated that the United States Attorney General had signed a declaration stating that "disclosure [of FISA material] or an adversary hearing would harm the national security of the United States."

Following an in camera review of the FISA materials, the district court denied the defense motion for disclosure:

> The defendants made their instant request for disclosure in conjunction
> with their demand for suppression.  That request, if read narrowly and
> literally, is likewise moot, as there is not now and may never be a review
> of the lawfulness of any FISA-derived evidence.  Nonetheless, viewing
> their demand as one for discovery on whatever basis might be available
> to them, I have reviewed the Acting Attorney General's affidavit with an
> eye to any other possible basis for disclosure, including the *Brady*
> doctrine. *Brady v. Maryland*, 373 U.S. 83 (1963).

information in issue here implicates national security.  Similarly, neither the prosecutorial decisions in this case nor the possibility of graymail . . . comes within our purview."  *United States v. Abu Ali*, 528 F.3d 210, 253 (4th Cir. 2008) (citing *United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990)).

> On review of the classified materials submitted under seal for in camera review, I have no doubt that the Attorney General's declaration is well-taken. The FISA-related materials contain considerable operational and technical information [much of it required by the statute] about how FISA orders are implemented. Were that information to become known, the ability to use those operational methods and technical means could be impaired, with potential adverse consequences on the government's ability to obtain useful foreign intelligence information, and, in turn, on national security. In addition, I see nothing in those materials that comes within the government's *Brady* obligations, or otherwise could properly provide a basis for granting the defendants' motion for disclosure.

The defendants assert on appeal that the district court's denial of their motion to compel disclosure of FISA material did not comport with the due-process requirements of 50 U.S.C. § 1806(g), which states: "If the court determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that *due process* requires discovery or disclosure." (emphasis added).

The district court appears to have considered disclosure of FISA-derived information—as it did with respect to CIPA information—at least in part through the lens of *Brady* materiality. In denying the motion, the judge stated, "I have reviewed the Acting Attorney General's affidavit with an eye to *any other possible basis for disclosure*, including the *Brady* doctrine. . . . In addition, I see nothing in those materials that comes within the government's *Brady* obligations, or otherwise could properly provide a basis for granting the defendants' motion for disclosure." (emphasis added). The court references *Brady*, as well as other unnamed possible bases for disclosure.

Defendants claim that no appellate court "has addressed the breadth of FISA's due process disclosure standard" and urge this court to adopt the "relevant and helpful" *Yunis* standard from the CIPA context, rather than the more stringent *Brady* standard. The United States counters that the "the *Brady* standard is coterminous with the requirement of due process embraced" by FISA. *See United States v. Spanjol*, 720 F. Supp. 55, 59 (E.D. Pa. 1989) ("Thus, to the extent that Fed. R. Crim. P. 16 allows discovery . . . beyond exculpatory information constitutionally mandated by

*Brady* . . . and its progeny, it is inapplicable to discovery of intelligence information collected under [FISA].").

Without deciding which standard is appropriate, we conclude that the defendants were not entitled to receive any of the FISA-derived information.  First, we agree with the district court that none of the information derived from FISA would need to be disclosed under *Brady*.  Second, after a review of the entire record with respect to the claims concerning FISA-derived evidence, we find that there was nothing "relevant and helpful to the defense." *Yunis*, 867 F.2d at 623.

## III. Sufficiency of Evidence

Defendants challenge the sufficiency of the evidence underlying their convictions.  Their claims are without merit.

## A. Standard of Review

Reviewing a sufficiency of the evidence challenge, "this Court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  We will reverse a conviction due to insufficient evidence only when the "judgment is not supported by *substantial and competent* evidence upon the record as a whole." *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005) (emphasis added) (citation omitted).

## B. The Conspiracy Charges

Count 1 of the superseding indictment alleged that from June 2004 to February 19, 2006, Amawi, El-Hindi, and Mazloum did "willfully combine, conspire, confederate and agree to kill or maim persons in locations outside of the United States, to include U.S. armed forces personnel serving in Iraq."  Count 2 alleged that from June 2004 to February 19, 2007, Amawi, El-Hindi, and Mazloum "did conspire, confederate and agree with others known and unknown to the Grand Jury to provide material support and

resources, knowing and intending they were to be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 2332 (killing of U.S. nationals)."

The distinguishing feature of a conspiracy is the agreement to violate the law. *Iannelli v. United States*, 420 U.S. 770, 777 (1975). The government need not prove that each defendant knew every detail of a charged conspiracy, but the government must prove that each defendant adopted the conspiracy's main objective. *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000).

## 1. Amawi

Amawi contends that the evidence only establishes that he sought training for self-defense purposes, for reasons totally unrelated to terrorist activities, and that the government failed to show that he intended to participate in a plan to kill U.S. military personnel or provide material support to terrorists. This account is not supported by Amawi's own words. The record contains ample evidence to support his conviction.

Amawi told Griffin, quite explicitly, that he "he wanted to go to perform Jihad against the U.S. troops overseas." To that end, Amawi gave Griffin a number of jihadist videos that could be used for training other terrorists. Amawi also recruited Mazloum to participate in training with Griffin. Amawi's argument that he was simply seeking training to promote his ability to defend himself is implausible in light of the skills he sought to acquire, including the construction of IEDs, suicide bomb vests, and other explosives.

## 2. El-Hindi

El-Hindi argues that the evidence is not sufficient to connect him to the conspiracy charges. This is not the case. El-Hindi also offered to recruit "brothers" in Michigan for jihadi training. El-Hindi, along with Amawi and Griffin, watched jihadi videos depicting the use of explosives. While watching these training videos, El-Hindi commented about the techniques and discussed ways of using them to harm American interests. El-Hindi hatched a plan to seek funding for training through a fraudulent federal grant. Perhaps most importantly, El-Hindi hosted at his home the only meeting

where Griffin, Amawi, Mazloum, and El-Hindi congregated and discussed methods of carrying out their unlawful aims. At this meeting, El-Hindi mentioned that he could obtain a grant for $95,000 for the purposes of the agreement. There is more than enough evidence available for a jury to conclude that El-Hindi sought to fund the operations.

### 3. Mazloum

Mazloum contends that any training he sought was to improve his physical fitness and develop his military training if he were ever to return to his home in Lebanon. He also asserts that the actions were protected speech under the First Amendment, as he was simply expressing his opposition to American foreign policies. The evidence tells a different story. After agreeing to undergo training by Griffin with Amawi, Mazloum stated that the "fight is in the . . . land of the Army." App. 95, Gov't Ex. 4C, at 10-69185-2a. Mazloum asked Griffin if he had the "weapons ready" and offered to contribute money to the operation. App. 95, Gov't Ex. 4C, at 10-69185-6a. Later, Mazloum clearly stated his interest in IED training. The record has more than enough evidence to show Mazloum's understanding of the purpose of the training.

### 4. The Common Plan

The defendants argue that collectively they did not share any sort of common plan: "The evidence was insufficient to prove Amawi and [the other defendants] formed an actual *agreement* to pursue the *same* criminal objective . . . ." Amawi Br. at 23. Specifically, defendants argue that they expressed different objectives and never agreed on a single target. However, this is not the correct standard of proof. The government does not need to prove that a formal agreement to commit the same offense existed. Acts that "may reasonably be interpreted as participation in a common plan" can be used to establish an implicit agreement. *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002); *see, e.g.*, *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009) (noting that "a tacit or mutual understanding is sufficient, so long as the agreement is proven beyond a reasonable doubt"); *United States v. Milligan*, 17 F.3d 177, 182–83 (6th Cir. 1994) (noting that "[a] conspiracy may be inferred from relevant and competent circumstantial

evidence, such as the acts of the conspirators themselves"); *United States v. Hughes*, 891 F.2d 597, 601 (6th Cir. 1990) (stating that "the existence of a conspiracy may be inferred from acts done with a common purpose").  "To prove a single conspiracy, the government need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Smith*, 320 F.3d 647, 653 (6th Cir. 2003).

On February 2, 2005, Amawi and El-Hindi, along with Griffin, met for the first time at Amawi's home.  At that point, Amawi had already recruited Mazloum to their enterprise.  Amawi showed El-Hindi and Griffin jihadist videos depicting "martyrdom" operations.  El-Hindi requested copies of the videos.  On February 16, 2005, Griffin, Amawi, Mazloum, and El-Hindi all met together to discuss various plans.  At the meeting, Griffin stated that their preparation was a means to "join the brothers overseas." This is a direct reference to joining jihadists fighting United States military forces.  The training was not limited to a specific country, but rather was tailored to the specific needs of such a conflict.  This meeting, where none of the attendees expressed any dissension, demonstrates a "collective venture" and more than supports the evidence needed to defeat a sufficiency challenge to the conspiracy charge.  *Ibid.*[3]

The evidence shows that Amawi, El-Hindi, and Mazloum shared an intent to engage in activities that were aimed at killing or maiming United States military personnel and that they participated in a common plan to provide material support to these activities.  The government does not need to prove that all of the conspirators agreed on the same country or the same targets or the same means.

---

[3]Defendants also repeatedly mention that this was "the first and only time" all three of them met, Amawi Br. at 7, arguing that the lack of any additional group-wide gatherings renders insufficient the government's evidence of a conspiracy, *id*. at 30.  We have made clear, however, that the crime of conspiracy requires neither a minimum period of duration nor a minimum number of meetings. *See United States v. Warshak*, 631 F.3d 266, 309 (6th Cir. 2010) (noting that "the temporal scope of a conspiracy is not an essential or material element of the charge" (internal quotation marks omitted)).  Thus, the limited nature of defendants' contemporaneous interactions has no bearing on their guilt.

**C. Explosive Device Charges Against Amawi**

Count 3 charged Amawi alone with, from January 10 to January 30, 2005, knowingly distributing information pertaining to the manufacture or use of an explosive device with the intent that such information be used in furtherance of an activity that constitutes a federal crime of violence, in violation of 18 U.S.C. § 842(p)(2)(A). Count 4 charged Amawi alone with, on February 6, 2005, knowingly distributing information pertaining to the manufacture or use of an explosive device with the intent that such information be used in furtherance of an activity that constitutes a federal crime of violence, in violation of the same section.

With respect to Count 3, the government introduced evidence showing that on January 30, 2005, Amawi showed Griffin a jihadist video demonstrating in detail how to build a bomb vest. While playing the video, Amawi translated the Arabic explanations for Griffin, who did not speak Arabic. On appeal, Amawi asserts that he did not show Griffin the video for educational purposes and that his failure to successfully transfer the video shows that Amawi lacked the requisite intent. Griffin testified that he watched the video in the context of compiling training materials and discussed various places to train and test the explosives. It was reasonable for the jury to conclude that watching and discussing how to apply the techniques taught in this video provided the requisite intent for what was clearly the forbidden act of distribution.

With respect to Count 4, the government introduced evidence showing that, on February 6, 2005, Amawi gave Griffin an electronic file containing a guide written in Arabic describing the process to manufacture explosives (this file was one of hundreds contained on a CD). Amawi claims that because Griffin could not understand Arabic and because the pair did not discuss this document, the requisite intent is not present. However, the evidence showed that Griffin and Amawi were pooling together documents to develop a library for jihad training. A reasonable juror could conclude that this document, even if it could not be read by Griffin, could be, and was intended to be, assembled into a collection for the benefit of jihadists.

There is sufficient evidence to support a jury verdict on Counts 3 and 4.

**IV. Expert Testimony**

This court reviews for an abuse of discretion whether the district court properly admitted or excluded expert testimony under Federal Rule of Evidence 702. *See United States v. Bender*, 265 F.3d 464, 472 (6th Cir. 2001). The district court permitted Evan Kohlmann to testify on behalf of the United States but excluded Jon Alterman and Reza Aslan from testifying on behalf of the defendants. Neither decision constituted an abuse of discretion.

**A. Admission of Testimony of Government Witness**

The government sought to call Evan Kohlmann, who specialized in collecting information from the internet about terrorist organizations, to testify about how terrorist organizations use the internet to recruit and train prospective jihadists. Defendants moved to exclude Kohlmann's testimony *in limine*. Prior to trial, the district court found that Kohlmann would be qualified to testify about how terrorists "use the internet to disseminate" the videos, the "difficulties encountered" in obtaining the videos, "the apparent purposes in creating and distributing" the videos, and "how internet users may be able to locate and access such materials." However, the district court did not permit Kohlmann to testify "about the source, nature, and utility of the materials" because discussion of various terrorist organizations (such as Al-Qaeda) that may have created such materials would be unduly prejudicial and not relevant. The court granted the defendants' motion to exclude Kohlmann's testimony, largely to prevent Kohlmann from testifying that the defendants viewed electronic material created by groups like Al-Qaeda.

During cross-examination by El-Hindi's attorney, an FBI computer analyst testified that he did not find any internet history on El-Hindi's computer that indicated that El-Hindi had visited a website that led to the bomb-vest video. The United States sought to allow Kohlmann to testify to rebut an inference that El-Hindi had never accessed the website—notwithstanding the lack of any specific internet history showing such access. Specifically, Kohlmann would testify that certain audio that was recorded

during conversations between El-Hindi and Griffin was audio that was prominently played on numerous jihadist videos. In other words, the government wanted to show that even though the evidence that El-Hindi viewed the files did not appear on El-Hindi's computer, the fact that El-Hindi was present when certain audio was being played could imply that El-Hindi watched certain terrorist videos. Kohlmann was also called to testify about how difficult it was to obtain these videos, showing the great lengths to which the defendants went in order to obtain them. The district court permitted Kohlmann to testify, finding a sufficient "nexus" between the proffered testimony and other relevant evidence, as it helped to prove defendants' intent in obtaining these videos. However, the court said it would contain the testimony if "it start[ed] to ooze out of other directions . . . . I think we have enough of a nexus, and my desire is to see to it that the evidence is contained and limited."

El-Hindi claims that Kohlmann's testimony covered topics that the district court had previously excluded because it impermissibly "insert[ed] the specter of Al Qaeda into the trial." El-Hindi Br. at 30; *see also id.* at 32–35. The bulk of these objections occurred while the United States was qualifying Kohlmann as an expert—during this process, he referred several times to Al-Qaeda, Usama Bin Laden, Ayman Al-Zawahiri, and aspects of terrorist organizations in Iraq. However, there was no reference made to the jury of any connection between these known terrorists and the defendants. El-Hindi also asserts that Kohlmann was permitted to translate documents from Arabic, even though he was not established to be fluent in Arabic.

Prior to Kohlmann's testimony, the court notified the jury that Kohlmann may refer to "Al-Qaeda or any other foreign terrorist organization" and reminded the jury that "there's no evidence that any of these defendants sought out, communicated with any such organization, or on the other hand, that any such organization sought them out or undertook to communicate with them at any time whatsoever." Kohlmann's testimony focused on how the defendants would have obtained the information, not the source of the information. This fact was quite probative to show their intent as part of the conspiracy. Any allusions to Al-Qaeda or other terrorist organizations or leaders were

not sufficient to result in reversible error.  In light of the jury instruction and the narrow focus of what Kohlmann was permitted to testify about, we hold that the admission of Kohlmann's testimony did not constitute an abuse of discretion.

**B. Exclusion of Testimony of Defendants' Expert Witnesses**

The defendants sought to offer two expert witnesses.  The first witness, Reza Aslan, would have testified about the history of Islam, jihad, and the rise of modern-day jihadist social movements.  The second witness, Jon Alterman, would have testified about politics and cultural norms in the Middle East, specifically focusing on attitudes towards the United States and its foreign policy.  The district court granted the United States's motion to exclude the testimony from Aslan and Alterman, reasoning that the testimony would not be relevant and would confuse the jury.  The court found that "[j]ust as this case is not about 'Terrorism' writ large, it is not about Islam or jihadist movements generally." Further, the testimony's "probative value as to [Amawi's] intent is substantially outweighed by its tendency to confuse the issues in this case."

On appeal, defendants assert that, without the testimony of Alterman and Aslan, the defense could not explain Islamist religion and cultural norms to the jury and that the jury was thus "without the necessary knowledge to understand, let alone consider, innocent explanations for Appellants' behavior and statements." Further, the defendants argue that "the district court denied the defense the ability to explain to the jury the religion of Islam, to explain Middle Eastern views on the viewing of such materials, and explain that viewing such materials does not a 'terrorist' make." Mazloum Br. at 39.

None of the charges in the indictment were of "terrorism" or related to any Islamist jihadist movement.  The district court stressed throughout the entire trial that the defendants were not accused of terrorism, especially of the extremist Islamist variety.  Testimony about Islamist and jihadist culture would not aid the jury in determining whether the defendants conspired to kill or maim Americans or provided material support to persons with such objectives outside the United States.  In addition, there is a very weak link, if any, between Middle Eastern cultural norms and the relevant states

of mind of the defendants with respect to the conspiracy charges.  The district court's decision to exclude Alterman and Aslan was not an abuse of discretion.

## V. Denial of Motion for Continuance

This court reviews a district court's decision whether to grant or deny a motion for a continuance for an abuse of discretion.  *See, e.g.*, *Warshak*, 631 F.3d at 298. "Denial amounts to a constitutional violation only if there is an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for a delay." *Ibid.* (internal quotation marks omitted).

After Amawi was indicted in February 2006, the district court appointed the Federal Public Defender to represent him.  Eight months later, in October 2006, the Federal Public Defender moved to withdraw, stating that Amawi did not trust him, as he was paid by the government.  The district court granted the motion to withdraw on October 24, 2006, and appointed two new attorneys to represent Amawi, Bradley F. Hubbel and John Czarnecki.  After Amawi complained about his representation again, on August 27, 2007, the district court appointed Elias Muawad, an Arabic-speaking attorney, to Amawi's defense team.  After further complaints, on October 18, 2007, the district court appointed William W. Swor as Amawi's lead counsel and allowed Hubbel and Czarnecki to withdraw.  Later, Amawi requested the reappointment of the Federal Public Defender after Swor could not devote substantial time to prepare his case.

On January 15, 2008, the Federal Public Defender's office—including the Federal Public Defender himself, three assistants, two research and writing specialists, an investigator, and other support staff—was reassigned to the case.  Muawad continued to represent Amawi.  Three days later, the Federal Public Defender moved to continue trial for 90 days.  At that time, the trial was scheduled to begin about six weeks later on March 4, 2008.  The Federal Public Defender stated that his team needed more time to review the voluminous record—which contained almost 200,000 electronic files and 300 hours of recorded audio and video evidence—prior to trial.  The district court denied this request to continue the case, noting that the Federal Public Defender "did do a substantial amount of work" on the case when it was initially assigned to represent

Amawi.  The district court remarked that, based on the projected timeline for the trial, the defense would not have to begin its case-in-chief until early June, giving counsel in effect five months from the date of the motion.  In addition, Amawi's co-defendant, El-Hindi, opposed any continuances.  El-Hindi, who had been detained for almost two years at the time of trial, "vigorously complained about the continuances" and would have moved to sever his trial if an additional continuance were granted.  In light of these factors, the district court denied the motion for a continuance.

On March 14, 2008, during the impanelment of the jury, the Federal Public Defender filed another motion to continue the trial until April 1, 2008, which the district court granted.  After Amawi's conviction, counsel moved for a new trial, arguing that the Federal Public Defender was denied adequate preparation time.  The district court denied this motion.

The record in this case is indeed gigantic.  However, in light of all of the factors in this long, complicated, and multi-faceted case, it was not an abuse of discretion for the district court to deny the motion for a continuance.  First, Amawi created the circumstances giving rise to his need for continuances with his repeated requests for new counsel.  Second, although the Federal Public Defender was only brought back onto the case two months prior to trial, in 2006 the Defender's office had been on the case for eight months and had had significant time to review the materials in the case.  In 2008, upon its reappointment, the Defender was not starting from scratch.  Second, the district court also had to consider El-Hindi's concerns.  At the time of the trial, El-Hindi had been incarcerated for more than two years and adamantly opposed further continuances. If the trial were delayed any further, El-Hindi would have moved to sever his trial.  The district court properly credited the need to try all of the defendants together as a reason for denying the continuance.

In any event, Amawi fails to demonstrate that "the denial resulted in actual prejudice to his defense." *Landrum v. Mitchell*, 625 F.3d 905, 927–28 (6th Cir. 2011); *Warshak*, 631 F.3d at 298.  "Actual prejudice may be demonstrated by showing that additional time would have made relevant witnesses available or otherwise benefitted

the defense." *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003).  Amawi argues that if his defense counsel had had more time to review the video evidence, they could have identified "irrelevant, prejudicial" evidence and sought its exclusion *in limine*.  Amawi points to nothing specific that would have been prejudicial but rather relies on the fact that there *could* have been something prejudicial that *could* have been excluded.  This is not enough.  Despite the "mountains of discovery dumped at [his] feet," it was not prejudicial to deny Amawi the chance "to excavate in a mine that contained no ore." *Warshak*, 631 F.3d at 299.

## VI.  First Amendment Jury Instruction

Prior to the close of the trial, Mazloum requested a jury instruction that stated that he could only be convicted if his conduct was not protected by the First Amendment:

> The First Amendment of the United States Constitution guarantees to all persons the right of freedom of speech, right of freedom of association and the right of exercise of religion.  A defendant cannot be convicted on the basis of his beliefs or the expression of them, even if those beliefs are unpopular or favor violence.  You may find the defendant guilty if the government proves beyond a reasonable doubt that he committed the crimes charged in the indictment and that his conduct was not protected by the First Amendment.

The district court declined to give this instruction.  However, it did instruct the jury:

> Proof that people simply met together from time to time and talked about common interests, such as political views or religious beliefs, or engaged in similar conduct, is not enough to establish a criminal agreement.  You may consider these things in deciding whether the government has proved an agreement, but without more, they are not enough.

On appeal, the defendants assert that the district court's decision not to provide their requested instruction was in error.  This court reviews for an abuse of discretion whether a district court properly granted or denied an instruction request.  *United States v. Prince*, 214 F.3d 740, 761 (6th Cir. 2000).

The district court's decision to deny the requested instruction was not an abuse of discretion. First, although the conspiracy was closely related to, and indeed proved by, many of the defendants' conversations about political and religious matters, the conviction was based on an agreement to cooperate in the commission a crime, not simply to talk about it. The requested instruction would have directed the jury to acquit the defendants, even if every element of the crime was proved beyond a reasonable doubt, *if* the jury made the legal judgment that the conduct was protected by the First Amendment. The requested instruction was wrong as a matter of law. *See United States v. Mick*, 263 F.3d 553, 569 (6th Cir. 2001). Forming an agreement to engage in criminal activities—in contrast with simply talking about religious or political beliefs—is not protected speech. Second, juries can consider speech as evidence in a conspiracy. "The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (citing *Haupt v. United States*, 330 U.S. 631, 642 (1947)). Finally, the instruction the court provided properly informed the jury that merely talking with others about political or religious ideas, by itself, is not enough to support a conviction for the conspiracy charges. This claim is without merit.

## VII. Entrapment

Following the jury's verdict, El-Hindi moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, arguing that he was entrapped as a matter of law. El-Hindi did not present an entrapment defense during trial, and he consistently declined to inform the government whether he would present one. The district court denied this motion, ruling that El-Hindi waived an entrapment defense by not requesting an entrapment instruction and that, alternatively, the evidence presented on predisposition foreclosed acquittal as a matter of law. This court reviews a district court's denial of a post-trial motion "based on the purely legal issue[ ] of entrapment as a matter of law" *de novo*. *United States v. Al-Cholan*, 610 F.3d 945, 950 (6th Cir. 2010).

We reject El-Hindi's claim. A district court can find entrapment as a matter of law where (1) the testimony and facts are undisputed; and (2) the evidence demonstrates

a patently clear absence of predisposition. *United States v. Clark*, 957 F.2d 248, 250–51 (6th Cir. 1992). During trial, all three defendants declined to assert an entrapment defense. *United States v. Carpentier*, 689 F.2d 21, 27 (2d Cir. 1982) ("When entrapment is asserted as a defense, the government is entitled to notice of the proposed defense so that it may offer evidence of predisposition in rebuttal."). Thus, the government did not have the opportunity—or have the need to—present evidence to demonstrate predisposition. However, as the district court noted, the evidence is sufficient to show that El-Hindi was a willing and active participant in the conspiracy. Had the government been on notice that El-Hindi would assert an entrapment defense, it could have easily sustained its burden of showing predisposition. This claim is without merit.

## VIII. Outrageous Conduct

Following the close of trial, Mazloum moved to dismiss the indictment on the ground that Griffin's conduct in creating a "terrorist cell" "shock[ed] the conscience of the public and should not be countenanced." The district court denied this motion. This court reviews whether "outrageous government conduct" is a valid basis for dismissing an indictment—a question of law—*de novo*. *United States v. Tucker*, 28 F.3d 1420, 1421 n.1 (6th Cir. 1994).

This court has soundly rejected the "outrageous government conduct" defense, looking instead to the doctrine of entrapment to assess a defense that sounds in inducement:

> [A] defendant whose defense sounds in inducement is, by congressional intent and Supreme Court precedent, limited to the defense of entrapment and its key element of predisposition. Defendants may not circumvent this restriction by couching their defense in terms of "due process" or "supervisory powers." Thus, we reject as a matter of law the theory upon which defendants based their motion to dismiss without regard to the particular facts of their case and without reaching the issue of whether or not those facts can properly be characterized as "outrageous."

*Id*. at 1428; *see Al-Cholan*, 610 F.3d at 952 ("[W]e have never applied the 'outrageous government conduct' defense, and have stated that 'there are . . . strong reasons for

concluding that such a defense simply does not exist.'" (quoting *Tucker*, 28 F.3d at 1427)); *United States v. Blood*, 435 F.3d 612, 629 (6th Cir. 2006) (holding "that the outrageous government conduct defense is not available where the defense is based either on a theory of government inducement . . . or on a theory that the 'undercover officer's involvement in creating [the] crime was so significant that criminal prosecution violates due process'" (citation omitted)).  At bottom, this claim sounds in entrapment. Mazloum would wish, by availing himself of an outrageous-conduct defense, to allege that the government entrapped him, without opening the door to the admission of evidence of predisposition.  Mazloum cannot bypass the risks inherent in our entrapment doctrine simply by calling his defense "outrageous conduct."  Even if this court were to recognize this defense, for much the same reasons we rejected El-Hindi's entrapment defense we would reject an outrageous-conduct claim on the merits.

## IX. *Miranda* Warnings

Amawi was arrested in Jordan and was transferred to a jet that flew him to the United States.  On board the jet, federal agents restrained him, blocked his view, conducted a cavity search, and photographed his body.  The agents informed Amawi that he was being transported to the United States—not Guantánamo Bay—where he would face criminal charges.  Agent Steven Gubanich read Amawi his *Miranda* rights.  After Gubanich said "if you decide to answer questions now without a lawyer present, you have the right to stop answering at any time," Amawi interrupted the reading, stating, "I'm going to wait."  Gubanich asked Amawi if "he wanted to talk to [them] or not." Amawi responded by asking if there was a lawyer on board the jet.  Gubanich said there was no lawyer on board and finished reading Amawi his *Miranda* rights.  Gubanich claimed Amawi's question meant he "was undecided whether he wanted to talk to us." After Gubanich finished reading the *Miranda* rights, Amawi signed the *Miranda* waiver form and spoke to the agents.  After two hours of interrogation, Amawi asked, "[w]ill there be a lawyer?"  Gubanich stated he believed Amawi was asking whether he was going to, at some point, be afforded an opportunity to speak with a lawyer.  Gubanich

said, "yes, there would be a lawyer made available . . . through the normal legal process in the United States." Gubanich then continued the interrogation.

Five hours later, Amawi stated "I guess I'm going to have to wait until I get a lawyer." Gubanich interpreted this to mean Amawi no longer wished to speak with agents without an attorney and stopped the interrogation. During the nine-hour interrogation, which included breaks, Amawi made numerous inculpatory statements that the government used at trial. Amawi admitted that the computers, disk drives, and zip drives that the FBI seized in Jordan belonged to him and that everything the FBI seized from his bedroom in his Toledo apartment belonged to him.

The district court denied Amawi's motion to suppress the statements made aboard the jet. The district court determined that Amawi's statements did not constitute an invocation of either the right to remain silent or the right to counsel and that his waiver of rights was made knowingly and voluntarily. The district court concluded that if there were any invocation of Amawi's right to remain silent, the invocation was conditional. That is, if an attorney was present, he would speak to an attorney first and wait to talk to the agents; if an attorney was not present, he would not wait to talk to an attorney and instead be willing to talk to the agents right away.

On appeal, Amawi argues that his statement that he was "going to wait" invoked his right to remain silent and his question about whether there was "a lawyer on board" invoked his right to counsel. Amawi also asserts that Gubanich failed to clarify Amawi's statement asserting the right to counsel. Amawi claims that Gubanich was required to clarify his ambiguous statement because it was made prior to a *Miranda* waiver. Amawi argues that when he said, "I'm going to wait," and when he asked, "is there a lawyer on board," Gubanich should have inquired to determine if Amawi did in fact want to speak. Amawi does not challenge that his later statement—"will there be a lawyer"—which came after two hours of interrogation, was not an invocation of his right to counsel. This court reviews the findings of fact regarding a suppression motion for clear error and the district court's conclusion *de novo*. *Al-Cholan*, 610 F.3d at 953.

Though this is not a run-of-the-mill *Miranda* case, the law controlling it is.  A defendant's invocation of his *Miranda* rights must be clear and unequivocal before interrogations must end.  *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010).  This court has held that "a suspect must assert his right to remain silent with sufficient clarity that a reasonable officer would perceive it as such under the circumstances." *Franklin v. Bradshaw*, 545 F.3d 409, 414 (6th Cir. 2008).  Stating that "I'm going to wait" and asking "is there a lawyer on board" is neither a clear nor unequivocal invocation of the right to remain silent or the right to counsel.  Simply mentioning the prospect of talking with an attorney, or waiting to talk until one is present, is not sufficient to put the agent on notice that a suspect has invoked his right to remain silent.  Gubanich's interpretation of Amawi's statements—that he was asking if he would be provided an attorney after he landed—is reasonable.  This is even more reasonable in light of the fact that it seems Amawi feared he was being transported to Guantánamo Bay, where he may have thought accessing a lawyer could be difficult, especially since the arguably ambiguous remarks were made in the middle of the *Miranda* recitation.  When he was fully warned, Amawi signed the *Miranda* form and talked to the agents.  After Amawi made these statements, the agent was not required to halt the interrogations.

Further, we reject Amawi's claim that the agent was required to ask clarifying questions in response to Amawi's ambiguous statements that might have been an attempt to invoke his *Miranda* rights.  No such requirement exists.  "If a suspect, however, makes an ambiguous or equivocal reference to an attorney there is no requirement that law enforcement cease questioning." *United States v. Montes*, 602 F.3d 381, 385 (5th Cir. 2010) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)).  Amawi cites *Kyger v. Carlton*, 146 F.3d 374 (6th Cir. 1998), to no avail.  That case simply held that an officer's response to a suspect's ambiguous statement was "an inappropriate effort at pressuring Kyger to answer, rather than an appropriate attempt to get Kyger to clarify his response." *Id.* at 379.  *Kyger* did not hold that there was an obligation for an officer to clarify an ambiguous response.  Here, the agent's responses contained no pressure whatsoever.  The district court did not err in denying Amawi's motion to suppress.

**X. Sentencing Appeal**

Each defendant had a total offense level of 58.  None of the defendants had any prior criminal history, though in light of the terrorism enhancement pursuant to United States Sentencing Guidelines (U.S.S.G.) § 3A1.4, each of their criminal history categories was increased to VI.  Each defendant had a recommended sentence under the Guidelines of life in prison.  The district court varied downward in sentencing each defendant.  Amawi received a sentence of 240 months of imprisonment; El-Hindi received a sentence of 144 months of imprisonment; Mazloum received a sentence of 100 months of imprisonment.  The district court denied a request to depart downward due to over-representation of the defendants' criminal history.

The United States has cross-appealed and asserted that these sentences are both procedurally and substantively unreasonable.

**A. Standard of Review**

This court reviews a district court's sentencing determinations for "reasonableness."  *See Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011) (citing *Gall v. United States*, 552 U.S. 38, 49–51 (2007)).  We "use an abuse of discretion standard to assess whether a sentence is unreasonable."  *United States v. Christman*, 607 F.3d 1110, 1117 (6th Cir. 2010).  A district court abuses its discretion when it imposes a sentence that is either procedurally or substantively unreasonable.  *Ibid.*; *see United States v. Hall*, 632 F.3d 331, 335 (6th Cir. 2011); *United States v. Baker*, 559 F.3d 443, 448 (6th Cir. 2009) ("[W]e review a district court's sentencing decisions 'under a deferential abuse-of-discretion standard' for reasonableness." (quoting *Gall*, 552 U.S. at 51)).

**B. Procedural Unreasonableness**

"A sentence is procedurally unreasonable where a district court . . . fails to consider the 18 U.S.C. § 3553(a) sentencing factors, selects a sentence based upon erroneous facts, or fails to adequately explain its chosen sentence and its deviation, if any, from the Guidelines range."  *Hall*, 632 F.3d at 335.  The United States on appeal

argues that the "sentences were therefore procedurally unreasonable because the judge failed adequately to explain them, based them on erroneous facts, and failed adequately to take into account the relevant statutory sentencing factors set out in 18 U.S.C. § 3553(a)." United States Br. at 120.

The district court held a separate sentencing hearing for each defendant over the course of two days, where numerous witnesses testified and provided information for the court to consider. The United States may disagree with the conclusions the district court drew, but it does not point out any "erroneous facts" relied on by the court. The district court accepted the presentence report's calculations as accurate, and there is no assertion that the Guidelines were calculated incorrectly. The district court repeatedly mentioned and discussed each of the factors listed under 18 U.S.C. § 3553(a) and explained the ways in which the facts of this case caused it to vary from the Guidelines. The United States's procedural-reasonableness argument—which it only asserts half-heartedly—is without merit. Procedurally, the sentence was reasonable. At its heart, this appeal is a challenge to the substantive reasonableness of the sentence, which we consider next.

## C. Substantive Unreasonableness

"A sentence is substantively unreasonable if the district court 'selects a sentence arbitrarily, bases the sentence upon impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor.'" *Hall*, 632 F.3d at 335 (quoting *Baker*, 559 F.3d at 448). "In assessing substantive unreasonableness [this court] look[s] to 'the totality of the circumstances, including the extent of any variance from the Guidelines range,'" giving due deference to the district court's decision. *Christman*, 607 F.3d at 1118 (quoting *Gall*, 552 U.S. at 51).

The United States contends that the sentences were "substantively unreasonable because the district judge afforded unreasonable weight to factors he deemed to justify substantial deviations from the recommended guideline sentence." We disagree. The sentence is substantively reasonable.

The government claims that the district court "either virtually disregarded or merely paid lip service to the pertinent Section 3553(a) sentencing factors." 18 U.S.C. § 3553(a) provides:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the proper sentence to be imposed, shall consider—
> (1) the nature and characteristics of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
> . . .
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant;
> . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . .

The district court discussed and considered each factor in detail. However, the government challenges the "amount of weight [given] to [the] pertinent factor[s]." *Hall*, 632 F.3d at 335.

## 1. Nature and Characteristics of the Defendant

With respect to the nature and characteristics of the offense, the government points to Amawi's poor behavior while in pretrial confinement, which resulted in disciplinary actions. The district court remarked that there was "simply not any justification" for Amawi's behavior. The government claims that this poor behavior, which the court recognized, cuts against the district court's determination that "on balance" Amawi's history and characteristics did not "justify a life term of imprisonment." The government asserts that the district judge gave "little rationale to justify his substantial variance from the recommended Guideline sentence, and certainly none that would overcome the seriousness of Amawi's offenses and his poor disciplinary record while awaiting trial." For Mazloum, the government claims that the district court should not have given much weight to the fact that Mazloum assumed certain responsibilities, such as working toward a degree and running a business. The

government raises no argument with respect to the nature and characteristics of El-Hindi's history.

These arguments are quite weak and selectively cherry-pick and focus on very small segments of the voluminous record that show aspects of the defendants' nature and characteristics that cut against varying downward. There was more than enough evidence adduced during the sentencing hearings that would reflect positively on the nature and characteristics of the defendants' history to counsel a downward variance. The district court's consideration of these factors, and the weight attached to them, did not constitute error.

**2. The Need To Afford Adequate Deterrence To Criminal Conduct**

The government cites earlier statements made by the district court regarding Amawi recruiting Mazloum into the conspiracy and Amawi's extensive library of jihadist materials as evidence that "the judge's decision that a 60 percent reduction in the recommended Guideline sentence would adequately deter Amawi was plainly unreasonable." United States Br. at 132. With respect to Mazloum, the government claims that the district judge simply stated "his belie[f] that this [sentence] will adequately deter the defendant." *Id.* at 133 (internal quotation marks omitted). However, the government notes that the district court also stated that it feared that Mazloum's zeal "might someday flare back up." *Id.* at 134 (internal quotation marks omitted). With respect to El-Hindi, the government claims that the district court did not discuss at all the issue of deterrence. The district court also gave some weight to the age of the defendants. At the time of the sentencing, Amawi was 29, El-Hindi was 46, and Mazloum was 28. The government asserts that this was in error, as "nothing suggests that Amawi's zeal for engaging in violent jihad decreased as he aged. Consequently, his age upon release should have had no bearing on specific deterrence."

We disagree. First, with respect to Amawi, it was reasonable for the district court to credit the fact that if he serves his entire sentence, he would have spent nearly half of his remaining life in prison when released. Further, it was reasonable for the district court to conclude that the lifetime of supervised release included in the sentence would

be additional deterrence.  The district court had no doubt that "Amawi will be very closely monitored and supervised and his conduct will be very closely overseen and that will provide the protection that the government seeks in its request for a lifetime term." The district court did not merely recite the sentencing factors or pay lip service to them.

Second, with respect to Mazloum, the district court certainly expressed concerns about Mazloum perhaps engaging in criminal conduct in the future but, weighing all the circumstances, determined that this factor did not counsel against a variance downwards. The court's explanation on this element was thoughtful and well-reasoned.

Third, with respect to El-Hindi, the district court stated that his sentence would serve as a "signpost" warning others not to engage in such conduct.

> [A]lthough I do not think that a sentence of this length is necessary to either incapacitate or to deter Mr. El-Hindi from further criminal conduct as to either of these sets of crimes of which he stands convicted; nonetheless, I think that it is appropriate for the government to ask me and for me to respond to that request to try and communicate through this sentence, and I think this does so, to those who might be tempted to take their opposition to our government and its policies, whatever those policies may be, whether they're domestic policies or foreign policies, but for those who might be tempted to take the first steps in the path towards generating a risk of harm to our fellow citizens or to anyone else . . . .

The court's consideration of deterrence was stated succinctly and was not unreasonable.

Though these reasons may be unsatisfactory to the government, the district court gave due attention and reasonable consideration to whether their sentences would provide adequate deterrence to future criminal conduct.

**3. Need to Avoid Sentencing Disparities**

The need to avoid sentencing disparities is really the gravamen of the government's appeal.  The government cites a number of recent cases with much heavier sentences involving convictions of this type.  In *United States v. Abu Ali*, a divided panel of the Fourth Circuit reversed the district court's decision to sentence the defendant—who had a total offense level of 49 and a criminal history category of VI—to

360 months for violating, *inter alia*, 18 U.S.C. §§ 2339A and 2339B.  528 F.3d 210, 258 (4th Cir. 2008).  The court found that "[b]ased on the foregoing circumstances of this case, we find the district court's significant downward deviation not to be justified." *Id.* at 269.  In *United States v. Mustafa*, the Second Circuit upheld a sentence of life imprisonment for violating, *inter alia*, 18 U.S.C. §§ 2339A, 2339B, 842, and 956.  406 F. App'x. 526, 528 (2d Cir. 2011).  Recently, in the "Millennium Bomber" case, the Ninth Circuit en banc, in a split decision, reversed the district court's 264-month sentence of Ahmed Ressam for violating, *inter alia*, 18 U.S.C. §§ 2332b and 842, finding that the sentence was too light.  *United States v. Ressam*, 679 F.3d 1069, 1071–72 (9th Cir. 2012) (en banc) ("Upon our review of the record, we conclude that the district court abused its discretion in sentencing Ressam as it did. As a result, we conclude that the sentence imposed by the district court was substantively unreasonable.").  The government claims that the "resulting disparity [between the sentence of the three defendants here and] with these other sentences, plainly contravened the objective of Section 3553(a)(6)."  The government also challenges the failure of the district court to explain the disparity between the sentence of Amawi (240 months), El-Hindi (144 months), and Mazloum (100 months).

The district court did not create unwarranted disparities.  Though these other cases all involve terrorist-related offenses, they bear significant factual dissimilarities that do not create any reversible tension with the district court's downward variance.

Our case is not on the same order of magnitude as *Ressam*, where the so-called "Millennium Bomber" was apprehended trying to enter the United States with a vehicle full of explosives.  Certainly Amawi conspired to obtain explosives, but he never managed to obtain them.  The defendant in *Abu Ali* was convicted of charges stemming from his affiliation with an Al-Qaeda terrorist cell in Saudi Arabia.  The government adduced no proof that Amawi was affiliated with Al-Qaeda or any other terrorist group. The defendant in *Mustafa* admitted to killing people and associating with terror groups. There was absolutely no evidence introduced at trial that any of the defendants actually killed anyone.  *Ressam*, *Abu Ali*, and *Mustafa* are sufficiently different that the district

court was not unreasonable.  We also note that *Mustafa*, in upholding a life sentence, did not hold that this sentence was always appropriate in such cases.  In light of the fact that these other cases involved much more serious conduct, the district court properly weighed factors with respect to avoiding sentencing disparities.

In addition, having reviewed the classified record that was before Chief Judge Carr, in light of the § 3553(a) factors, we have no additional reasons to find error in the sentences given to the defendants.

## XI. Denial of Amawi's Motion For A New Trial

After the close of trial in December 2008, Amawi filed a motion for new trial pursuant to Fed. R. Crim. P. 33.  In the motion, Amawi contended that the district court erred in denying his request to review evidence relating to a Syrian with whom Amawi had communications concerning the acquisition of explosives.  The district court denied the motion, stating that the court had "undertaken a review of the classified information presented ex parte in light of the defendant's contentions in his new trial motion. Nothing was disclosed there that, by hindsight, should have been disclosed to defense counsel."

On June 13, 2011, Amawi filed another motion for a new trial.  Amawi contended that his defense team had learned of the whereabouts of the Syrian, allegedly named Hosam Tarsha, after speaking with someone who may have been Tarsha's mother.  Amawi's motion sought to compel the government to furnish information, including classified information, concerning Hosam Tarsha, and any facts that it might possess relating to Amawi's contacts with him.

The district court directed Amawi to supplement the motion with an affidavit demonstrating that he had contacts with the Syrian and how those conversations could have generated any exculpatory information that the government could possess.  Amawi declined to provide such an affidavit, fearful that it would be incriminating.  The district court denied the motion on the merits, finding that the "newly discovered evidence" did not support the new claim that Amawi was actually only involved in a scheme with the

Syrian to bilk Griffin out of money under the pretenses of assisting terrorists.  The district court concluded that Amawi "produced no newly discovered evidence that ha[d] any bearing on the issues at his trial."  Finally, the district court concluded, after reviewing the government's ex parte submissions under CIPA, that the government had not produced any "evidence that was of the slightest possible use to the defense" with respect to the Syrian or any other topic and that there was no basis for believing that the government would have "withheld information, if it had any, of any pertinence to [Amawi's] contacts with the Syrian."

We agree with the district court's denial of Amawi's motion for a new trial on the merits.  Amawi's motion was vague, speculative, and only established that someone, who may be named Hosam Tarsha, was in Syria.  Nothing in the motion warranted granting a new trial.  Further, based on our independent review of the classified record, we conclude that there is no evidence that would have been "relevant and helpful" to the defense with respect to the Syrian.  *Yunis*, 867 F.2d at 622.  The district court did not abuse its discretion in denying Amawi's motion for a new trial.

## XII. Conclusion

All opinions and judgments of the district court are AFFIRMED.

_____

**CONCURRENCE**
_____


KAREN NELSON MOORE, Circuit Judge, concurring in the judgment. I concur in the majority's decision to affirm the district court's judgments on all issues in this appeal. But because I found the questions concerning the sufficiency of the evidence and the exclusion of two defense witnesses particularly difficult under the circumstances of this case, I write separately to lay out my analysis of those issues.

## I. SUFFICIENCY OF THE EVIDENCE

Amawi, Mazloum, and El-Hindi each disputes the sufficiency of the evidence supporting some or all of the convictions in this case. The superseding indictment, which was filed on February 2, 2007, charged the defendants as follows.

The first two of the counts in the superseding indictment involve conspiracies and applied to all three defendants. Specifically, Count 1 charged Amawi, Mazloum, and El-Hindi with willfully conspiring and agreeing "to kill or maim persons in locations outside of the United States, [including] U.S. armed forces personnel serving in Iraq," in violation of 18 U.S.C. § 956(a)(1). R. 186 (Superseding Indictment ¶ 8). Count 2 charged the three with conspiring and agreeing in violation of 18 U.S.C. § 2339A "to provide material support and resources, knowing and intending they were to be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 2332 (killing of U.S. nationals)." *Id.* ¶¶ 46, 58. The superseding indictment also charged Amawi and El-Hindi with two counts each of knowingly distributing to Griffin "information pertaining to, in whole or in part, the manufacture or use of an explosive or destructive device" with the intent that Griffin use those materials to train others "to commit and further a Federal crime of violence," in violation of 18 U.S.C. § 842(p)(2)(A). *Id.* ¶¶ 60, 62, 64, 66. All three defendants contest the sufficiency of the

evidence with respect to both conspiracy counts, and Amawi challenges his conviction on the two distribution charges.**1**

## A.  Conspiracy Charges

As to the conspiracy charges, the defendants maintain that the government failed to prove any actual agreement to commit the predicate offenses relating to killing or maiming U.S. nationals abroad.  *See* Amawi Br. at 24 ("The evidence showed Amawi, *at most*, had a general interest in training in the tactics of self-defense, security, and combat, but did not have any plan or agreement with others to put that training to use in any particular venue or at any particular time."); El-Hindi Br. at 13 ("Not only was there no violent act in this case.  There was not a plan for an attack.  There was no bomb possessed by anyone, no gun acquired by any defendant, no explosive material, no map, no potential targets."); Mazloum Br. at 13 ("It is not required that the Government prove that the conspirators agreed on specific details of a plan, only that they agreed to its essential nature.  However, if there is no meeting of the minds, there is no conspiracy." (citation omitted)).  According to the defendants, there was no unified criminal objective, and thus, there also was no conspiracy.

"In reviewing the sufficiency of the evidence, the relevant inquiry is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Sliwo*, 620 F.3d 630, 633 (6th Cir. 2010) (internal quotation marks omitted).  We review the evidence de novo to determine whether, when taken in the light most favorable to the government, there is "substantial and competent evidence upon the record as a whole" to support each essential element of the offense.  *United States v. Barnett*, 398 F.3d 516, 521–22 (6th Cir. 2005) (internal quotation marks omitted).  In doing so, however, "we may not reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury."  *United States*

---

**1**Although El-Hindi's statement of issues challenges the sufficiency of the evidence supporting his two convictions under 18 U.S.C. § 842(p)(2)(A), El-Hindi's brief thereafter fails to mention the issue again or present any arguments against the convictions.  Thus, his failure to present any substantive challenge waives the issue on appeal.

*v. Warman*, 578 F.3d 320, 332 (6th Cir. 2009) (quoting *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)), *cert. denied*, 130 S. Ct. 1103 (2010).

"[T]he essence of the crime of conspiracy is agreement," and the government therefore "must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982) (internal quotation marks omitted).[2] Moreover, "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997). Thus, "[a] conspiracy requires: '(1) An object to be accomplished. (2) A plan or scheme embodying means to accomplish that object. (3) An agreement or understanding between two or more of the defendants whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means.'" *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir.) (quoting *United States v. Bostic*, 480 F.2d 965, 968 (6th Cir. 1973)), *cert. denied*, 528 U.S. 1051 (1999).

In establishing the existence of a conspiratorial agreement, the government is not required to show that each conspirator knew every detail of the conspiracy. It does, however, have to "show that a particular defendant knew the object of the conspiracy and voluntarily associated himself with it to further its objectives." *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000) (internal quotation marks omitted). "Although only slight evidence" is required to link a defendant to a conspiracy, "mere

---

[2]Although the statutory requirements for engaging in a particular type of conspiracy may vary—for instance, 18 U.S.C. § 371 requires proof of an overt act and 21 U.S.C. § 846 does not, *see United States v. Shabani*, 513 U.S. 10, 14 (1994)— in cases where the statute is otherwise silent on the requirements for a conspiratorial agreement, courts' descriptions of what suffices as proof of that element are generally consistent across various conspiracy statutes. *Cf.* Robert M. Chesney, *Beyond Conspiracy? Anticipatory Prosecution and the Challenge of Unaffiliated Terrorism*, 80 S. Cal. L. Rev. 425, 451 (2007) (applying general principles of conspiracy to determine the scope of liability under various terrorism-related statutes and noting that "[m]ost conspiracy statutes—including the general federal conspiracy provision, § 371—are silent regarding the issue of agreement specificity, leaving the issue to be worked out in the case law"). Because there is no case law that directly addresses the requirements for a conspiratorial agreement under either § 956 or § 2339A and because both statutes are silent on the issue, this analysis will apply the general common-law principles that are applied in cases involving other conspiracy statutes in order to evaluate whether the evidence supports an agreement here.

association with conspirators is not enough"; instead "[t]he evidence must at least be sufficient that a reasonable juror could infer knowledge of and acquiescence in the agreement." *Gibbs*, 182 F.3d at 422 (internal quotation marks omitted). Even so, an agreement need not be explicit to establish a common criminal objective; "tacit or material understanding among the parties is sufficient." *United States v. Walls*, 293 F.3d 959, 967 (6th Cir.), *cert. denied*, 537 U.S. 1022 (2002). Thus, "[a] conspiracy may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan." *Id.*

### 1. The Alleged Agreement

For both conspiracy charges, the government focuses on a single meeting among the defendants as the onset of their illicit agreement. The three defendants were together only once, at a meeting on February 16, 2005. There, the FBI informant, Darren Griffin, generally led the discussion concerning the alleged training program and the defendants' respective plans for implementing the training abroad. Griffin's proposals were explicit; for example, he proposed training methods akin to those used by Osama bin Laden and the "brothers" in Hamas or Hezbollah, but "with a twist of what the U.S. does with their tactics." The defendants—and particularly Amawi and Mazloum—responded positively to these descriptions. When Griffin stated that the training group needed "committed brothers," for example, Mazloum responded that his brother "definitely" would join them. Both Mazloum and Amawi repeatedly requested training on particular topics, such as sniper use, explosives, and bomb making. El-Hindi similarly expressed interest in sniper training, noting that it was "the most important" because the U.S. Army is "petrified of snipers." In response to Griffin's proposals to do tactical training using paintball and eventually to teach demolitions, Mazloum responded, "We have to move on man . . . time is gold."

The men also discussed possible objectives for the training operation. Griffin explained that the tactics he would teach would differ slightly depending on where each of them wanted to go. He stated, "I know [Amawi] wants to go to Iraq, you know so, I'll prepare him for that. And, you know, brother [El-Hindi], maybe you want to go to

[Palestine], so there'll be some different tactics and techniques in there."  Amawi then volunteered that most important to him was the ability to teach others, and Griffin responded that he considered the three of them his "lieutenants," and that they would each eventually start their own "cells."  Amawi also stated that his "main targets" were presidents and leaders in the Arabic world.  Mazloum indicated that he was thinking of going to Iraq or the al-Sham countries.  A short time later, however, Mazloum asserted his interest in joining the Lebanese army, in part because he would receive helpful training through a six-month stint.

The February 16 meeting also included some discussion of funding.  When asked whether he had looked into obtaining grants, El-Hindi responded that "there's a lot of them."  Mazloum wondered what the grants were for and Griffin indicated that "it's for support here and support, you know our brothers overseas too."  Mazloum then offered to give Griffin money to find the right supplies.  Mazloum also asked whether it was possible to get money into Iraq.  In Arabic, Amawi, El-Hindi, and Mazloum then debated whether fighters in Iraq needed money, and Mazloum stated "[t]hey need weapons but money brings weapons . . . [w]e are here, how can we provide them with weapons?"  El-Hindi suggested that the fighters needed man-power instead.[3]

Toward the end of the meeting, Griffin tried to solidify plans for all four to meet again for handgun training, though the effort proved unsuccessful.  El-Hindi, however, reaffirmed his interest in training and suggested that he might be able to recruit some "brothers" in Michigan who already had a military background from serving in Qatar.  Throughout the meeting, the four discussed the need to involve only those who could be trusted.  After Griffin explained the need to be extremely "security conscious," Mazloum asked Griffin what they should tell anyone who asked what they were doing with Griffin, and Griffin responded that they should use his security company as a cover.

---

[3]Although El-Hindi was less vocal about his desire to train at the February 16 meeting, his statements on other occasions suggest that he was in agreement with the goal of receiving training in order to join the fight abroad.  For instance, El-Hindi affirmatively expressed interest in participating in a plan to train that involved "stuff that is going to take us away from our kids."

The discussion continued after Griffin, Amawi, and Mazloum departed El-Hindi's home. Mazloum at one point asked whether it was possible to access the Americans by dressing like them. Mazloum also suggested that they could forewarn the mujahideen of their arrival to avoid being mistaken for an enemy. Amawi expressed hesitancy about making too many connections in order to avoid implicating others if he were caught. On the question of reaching Iraq, Mazloum suggested that he had "many ways" to get there and that he could buy and sell parts using his legitimate business, and Amawi said that he could reach the area because he was a travel agent. Both Amawi and Mazloum, however, agreed that they needed to train first.

## 2. Count 1: Conspiracy in Violation of 18 U.S.C. § 956(a)(1)

In order to prove that Amawi, Mazloum, and El-Hindi conspired to kill or maim persons outside of the United States in violation of 18 U.S.C. § 956, the government had to demonstrate that the defendants agreed "to commit acts constituting murder, kidnapping, and maiming." *United States v. Hassoun*, 476 F.3d 1181, 1187 (11th Cir. 2007). The government also had to establish that each defendant (1) "willfully joined the agreement with the intent to further its purpose"; (2) that after the conspiracy was initiated, at least one of the defendants committed "at least one overt act in furtherance of the object of the conspiracy; and" (3) that "at least one of the conspirators was within the jurisdiction of the United States when the agreement was made." *United States v. Wharton*, 320 F.3d 526, 538 (5th Cir.), *cert. denied*, 539 U.S. 916 (2003).[4]

There is no doubt that the record is replete with reprehensible comments by the defendants and with instances in which the defendants watched and commented favorably on deplorable materials that relish the killing or maiming of many individuals and groups, including U.S. troops. Each defendant was also quite clear in a number of

---

[4]In full, 18 U.S.C. § 956(a)(1) provides

Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

instances that one of the goals in receiving training was to enable him to go abroad and join the fight against the U.S. military. In furtherance of this objective, El-Hindi additionally took steps to obtain grant funding to cover some of the training costs, and Mazloum and Amawi actively began engaging in firearms training with Griffin.

Other evidence in the record, however, supports the view that the defendants also had other reasons for seeking out training. Most prominent of these was the need for self-protection, which was mentioned repeatedly. On one occasion, for example, Mazloum stated that "all we are doing is training I mean . . . [i]f we are ever back in the home country one day, and something happens then maybe, but over here there is nothing. We are not this kind of people." A few seconds later, Amawi responded, "[s]omeone comes to your house, why not know how to deal with them. You know? You do this for yourself first." In a separate encounter, Amawi expressed a similar concern that people in Jordan "don't know how to use a gun" and would therefore be unable to defend their country and their families if necessary.

Despite varying evidence concerning the nature of the training objective, the jury specifically determined that the object of the defendants' conspiracy was twofold: to murder and to maim persons in another country. This is true notwithstanding the fact that the defendants did not agree on a particular target, though such specificity with respect to time, place, or victim generally is not required to support a conspiracy conviction. *See, e.g.*, *Williamson v. United States*, 207 U.S. 425, 449 (1908) ("It was not essential to the commission of the crime that in the minds of the conspirators the precise persons to be suborned, or the time and place of such suborning, should have been agreed upon, . . . as the criminality of the conspiracy charged consisted in the unlawful agreement to compass a criminal purpose . . . ."); *see also* Robert M. Chesney, *Beyond Conspiracy? Anticipatory Prosecution and the Challenge of Unaffiliated Terrorism*, 80 S. Cal. L. Rev. 425, 451 (2007).

Notwithstanding concern regarding the degree of attenuation between the defendants and their alleged goals as well as the breadth of their purported criminal objective, I believe that a reasonable juror could have found the evidence sufficient to

support the existence of a conspiratorial agreement.  The Eleventh Circuit's recent decision in *United States v. Jayyousi*, 657 F.3d 1085, 1105 (11th Cir. 2011), *cert. denied*, — S. Ct. —, 2012 WL 1079567 (2012), is somewhat illustrative.  There, the defendants had formed a support cell that was connected to multiple strands of the global terrorism movement.  The government also established that the defendants were engaged in coordinated efforts both to recruit members for the global movement and to send money and equipment overseas to various groups.  *Id.* at 1104.  In finding the evidence sufficient to support an illicit agreement, the court found it to be enough that the conspirators had a shared "intent to support jihad violence overseas to establish Islamic states."  *Id.* at 1105.

Although this case shares some characteristics with *Jayyousi*, the evidence here is not nearly as substantial.  For example, the agreement at the February 16 meeting did not go much beyond the need to obtain tactical training, which is not in itself an unlawful act.  Apart from sharing a common ideology and seeking training from Griffin, there was no specific common plan with respect to the larger goal of murdering or maiming persons abroad.  Unlike *Jayyousi*, there was also little evidence to suggest that the defendants were engaged in coordinated efforts to support one another in furthering their objective of committing violent jihad abroad.  *See id.* at 1105.  The defendants in *Jayyousi*, moreover, had actual connections with groups in the jihad movement, whereas here, the defendants had no such ties.  Thus, to some extent the defendants appear merely to have had similar individual objectives, which they sought to achieve through commonly available means.

Nevertheless, given the broad scope of prohibited conduct under § 956, I cannot conclude that no reasonable juror could have found the defendants guilty of the charged offense.  Although the agreement did not extend to specific targets or locations, each defendant individually expressed an intent to pursue the objective of killing or maiming abroad at an indeterminate time in the future, and all agreed to obtain training from Griffin at least in part for the purpose of attaining that ultimate goal.  Evidence also supports that the defendants each took steps directed at following through with the

training objective.  El-Hindi, for example, sought to obtain grant funding to support the training operations, and Mazloum and Amawi began their "training" by accompanying Griffin to a firing range where they could learn to use firearms.  Moreover, both at the February 16 meeting and on multiple occasions before and after, each defendant also specified an interest in other particular types of training, often while watching and commenting on websites and videos, and identified why those skills—which included training in the use of explosives, sniper rifles, and IEDs—would be useful once overseas.

Furthermore, although the evidence supporting the defendants' cooperation with one another to attain their objective was less than in *Jayyousi*, it was not nonexistent. At the February 16 meeting and on other occasions, the defendants discussed the size of their group and the need to find other "trusted brothers" in order to practice larger-scale tactical strategies.  The record also shows that each defendant in fact sought to recruit other "trusted brothers" to join the jihad training.  Amawi, for example, recruited Mazloum, who recruited his brother, Bilal, and El-Hindi had multiple conversations with Griffin about training two of El-Hindi's relatives, Khaleel and Zubair Ahmed, who had already traveled abroad in an attempt to perform jihad.  El-Hindi also suggested at one point the possibility of recruiting a few "brothers" he knew from Michigan. Additionally, although the February 16 meeting was the only instance in which all three defendants were together, at least two of the three defendants met together with Griffin on a number of other occasions both before and after that date.

Taken together, these facts establish that the defendants agreed to engage in training that had the purpose of allowing the defendants to join the fight against individuals in Iraq and elsewhere, thereby engaging in acts constituting murder or maiming of U.S. personnel.  Under basic principles of conspiracy law, it matters not that the defendants were far from achieving that ultimate objective. *See Iannelli v. United States*, 420 U.S. 770, 779 (1975) ("The basic rationale of the law of conspiracy is that a conspiracy may be an evil in itself, independently of any other evil it seeks to accomplish." (internal quotation marks omitted)).  Even if, as the defendants maintain, Griffin proactively led the most pertinent discussions about the activities of the proposed

training group, the defendants voluntarily associated themselves with those proposals with full knowledge of their intended objective. *See Crossley*, 224 F.3d at 856. Under our precedents, no more is required. Accordingly, I agree with the majority that the defendants' convictions under § 956 must be affirmed.

### 3. Count 2: Conspiracy in Violation of 18 U.S.C. § 2339A

Title 18 U.S.C. § 2339A makes it a punishable offense to "provide[] material support or resources or conceal[] or disguise[] the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" one of a number of enumerated sections, including 18 U.S.C. § 2332, which is the object offense identified in the superseding indictment. R. 186 (Superseding Indictment ¶ 46, at 10).[5] The statute also makes it a crime to attempt or to conspire to take any of the stated actions. 18 U.S.C. § 2339A(a).

Section 2339A broadly defines "material support or resources" to include tangible items, such as money or weapons, intangible items, such as training or advice, and human personnel, which encompasses both the recruitment of others and a defendant's own partnership with those seeking to carry out the substantive offense.[6] The statute is, however, subject to a specific-intent requirement. The evidence therefore

---

[5]18 U.S.C. § 2332 establishes criminal penalties for attempting or conspiring to kill or killing a U.S. national abroad and for engaging in physical violence against such individuals with intent to cause serious bodily injury.

[6]Specifically, the statute defines "'material support or resources'" as

any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

*Id.* § 2339A(b)(1). Notably, the term "personnel" has been read fairly generously. As one court observed, "[g]iven the ordinary meaning of the word 'personnel,' and its context within the statute, the statute prohibits the provision of persons who will be used in preparing for, or carrying out, the crimes listed in § 2339A—that is, persons who are jointly involved in participating in those crimes." *United States v. Sattar*, 314 F. Supp. 2d 279, 298 (S.D.N.Y. 2004), *aff'd sub nom. United States v. Stewart*, 590 F.3d 98 (2d Cir. 2009). Thus, for example, transmitting a *fatwa* from an incarcerated well-known terrorist leader, which the defendants knew would lead directly to the termination of a cease-fire, in effect constituted a "call to arms" that supported the defendants' convictions for providing material support in the form of personnel. *Stewart*, 590 F.3d at 114–16.

must also establish that the defendants provided or conspired to provide the support or resources as defined in § 2339A(b)(1) "*with the knowledge or intent* that such resources be used to commit specific violent crimes." *United States v. Stewart*, 590 F.3d 93, 113 (2d Cir. 2009); *see also* Chesney, *supra* at 485–86. But even so limited, § 2339A covers a broad range of both individual and conspiratorial conduct.

A recent case involving § 2339A is *United States v. Khan*, 461 F.3d 477 (4th Cir. 2006), which, not unlike this case, involved a group that engaged in intensive simulated combat exercises using paintball guns, as well as firearms training and marksmanship. *Id.* at 483. The group was comprised of members of an Islamic center, some of whom discussed a desire to go to Pakistan to train with a militant group known as LET and ultimately to go to Afghanistan to fight with the Taliban against the United States. *Id.* at 484. Others sought to join the fight against India in Kashmir. *Id.* In addition, a handful of these members—including some of the defendants—actually traveled to LET camps in Pakistan and participated in training in that location. *Id.* at 485. One of these defendants challenged a conspiracy conviction under 18 U.S.C. § 2339A, contending that there was insufficient evidence that he intended that equipment provided to an LET contact would be used in furtherance of a conspiracy to kill or injure persons in a foreign country. *Id.* at 488. But because that defendant was engaged directly with LET and because he knew that LET's goals included the destruction of India, the United States, and Israel, the Fourth Circuit upheld the conviction. *Id.* The court reached a similar result with respect to a different defendant who trained others in military techniques with the knowledge that those individuals planned to use the techniques upon joining a violent organization abroad, concluding that this too was sufficient to support § 2339A conviction. *Id.* at 490; *see also United States v. Mustafa*, 406 F. App'x 526 (2d Cir. 2011) (unpublished opinion) (providing specific training on methods for conducting violent jihad sufficient to support conviction under § 2339A).

As with Count 1, the parties' arguments concerning Count 2 generally focus on the absence of an agreement among the defendants as to the nature of the conspiracy. Regarding Count 2, the superseding indictment charges that the defendants conspired to

provide "money, training, explosives, communications equipment, computers or personnel, including the defendants, themselves." R. 186 (Superseding Indictment ¶ 48). As overt acts, the superseding indictment identifies the debate on February 16, 2005, among all three defendants concerning whether the Iraqi insurgency most needed money, weapons, or manpower, but focuses much more on Amawi's individual efforts to obtain astrolite for the Syrian individual and on Amawi's alleged attempt, along with Griffin, to provide laptops to members of the mujahideen while in Jordan.

Given the breadth of the statutory language under § 2339A, the evidence provides sufficient support for the convictions on Count 2. The reason for this is twofold. First, as discussed above, it is clear that the defendants agreed on the need to obtain training, and each did so at least in part based on a stated intent to join an insurgency abroad. The recorded conversations between the various defendants further indicate that they had full knowledge of the fact that, once abroad, either they themselves or others in the training group would be the material support—i.e., as personnel—to the mujahideen or others who they knew were preparing for or carrying out murder, attempted murder, or the causing of serious bodily injury to a U.S. national. Under the statute, it does not matter whether the individual defendants intended to carry out such acts themselves. *See Jayyousi*, 657 F.3d at 1105–06 (noting that the government did not have to prove the defendants' individual involvement in the object conspiracy, and instead needed to show only that the defendants knew they were supporting mujahideen who were engaged in such acts); *see also* 18 U.S.C. § 2339A(a); 18 U.S.C. § 2332.[7] Furthermore, as discussed above, each of the defendants sought on at least one instance to bring "trusted recruits" into the training group.

Second, the record also provides some support for the government's theory that the defendants additionally sought to send money or supplies to support the insurgency, though the February 16 meeting did not establish a specific plan to go about providing

---

[7]Notably, none of the defendants appears to have raised any challenge to the sufficiency of the evidence with respect to their intent to support the underlying object conspiracy or any type of vagueness challenge to the attenuated nature of their charges under § 2339A. Instead, they focus only on the absence of any conspiratorial agreement. Because these other arguments have not been raised, I express no opinion about them here.

those resources. Mazloum, for example, asked whether it was possible to funnel money to Iraq and offered to provide Griffin with money if Griffin could obtain appropriate supplies to send over. Amawi, whose actions comprise most of the overt acts cited in the superseding indictment, sought to obtain astrolite and created a plan with Griffin that was purportedly intended to deliver laptops to the mujahideen. Thus, a reasonable juror could conclude that the February 16 meeting established an agreement to provide resources that were needed to help the insurgency, including money, supplies, and trained personnel.

The government's heavy reliance on Amawi's actions to support this conspiracy count is troubling. Although Amawi was clearly attempting to obtain supplies for the Syrian individual, El-Hindi and Mazloum appear to have been completely uninvolved in these activities. Nevertheless, it is well established that each coconspirator need not be involved in every aspect of a conspiracy, so long as each "is a party to the general conspiratorial agreement." *Gibbs*, 182 F.3d at 421 (internal quotation marks omitted). Furthermore, once the agreement is in place, the coconspirators are liable for the acts of their coconspirators when such acts are in furtherance of the overall objective. *Salinas*, 522 U.S. at 63–64 (citing *Pinkerton v. United States*, 328 U.S. 640, 646 (1946)). Thus, as long as the evidence is sufficient to support a conspiracy in violation of § 2339A, Amawi's actions are admissible as part of the overall conspiracy.

As with the § 956 count, the evidence supporting the conspiracy under § 2339A is scattershot and disconcertingly attenuated from a realizable objective. Nevertheless, because I do not believe that the evidence was so sparse as to meet the demanding standard for overturning a jury verdict, the defendants' convictions on Count 2 must also be affirmed.

**B.  Distribution of Materials Regarding Explosives**

The final sufficiency challenge relates to Amawi's convictions on two counts of violating 18 U.S.C. § 842(p)(2)(A), which makes it unlawful

to teach or demonstrate the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to distribute by any means information pertaining to, in whole or in part, the manufacture or use of an explosive, destructive device, or weapon of mass destruction, with the intent that the teaching, demonstration, or information be used for, or in furtherance of, an activity that constitutes a Federal crime of violence.

The superseding indictment identifies the predicate crime-of-violence offenses[8] for both counts as 18 U.S.C. § 2332(a), which criminalizes the killing of a U.S. national, and 18 U.S.C. § 1114, which criminalizes the killing of any U.S. officer or employee, including members of the armed forces.  Both counts involved only the distribution-of-information portion of the statute and did not allege that Amawi had violated 18 U.S.C. § 842(p)(2)(A) by "teach[ing] or demonstrat[ing] the making or use of an explosive."

### 1.  Count 3:  The Bomb-Vest Video

With respect to Count 3, the superseding indictment alleged that Amawi "accessed a secure mujahideen web site and opened, viewed, and discussed with [Griffin] certain instructional materials and videos, including a video entitled 'Martyrdom Operation Vest Preparation,' which depicted the step-by-step construction and use of a suicide bomb vest."  R. 186 (Superseding Indictment ¶ 60, at 13).  The indictment further asserted that Amawi "displayed and translated [the video for Griffin], with the intent that [Griffin] use said instructional materials for training individuals in the construction and use of such bomb vests to commit and further a Federal crime of violence."  *Id.*  The facts supporting the charge are as follows.

On January 10, 2005, Amawi and Griffin together watched a number of videos, including the bomb-vest video.  At trial, Griffin indicated that they were viewing the videos with the purpose of compiling training materials.  As they viewed the bomb-vest video, Amawi translated parts of it, and, during other points, Griffin added explanation

---

[8]The "crime of violence" language in this statute engages the standard crime-of-violence language employed under 18 U.S.C. § 16. *See Leocal v. Ashcroft*, 543 U.S. 1, 7 n.4 (2004) ("[A] number of statutes criminalize conduct that has as an element the commission of a crime of violence under § 16. See, *e.g.*, 18 U.S.C. § 842(p) (prohibiting the distribution of information relating to explosives, destructive devices, and weapons of mass destruction in relation to a crime of violence)."); *see also United States v. Hull*, 456 F.3d 133, 138 (3d Cir. 2006), *cert. denied*, 550 U.S. 970 (2007).  The subsection is relatively new, and courts across the country therefore have had few opportunities to address it. *See Hull*, 456 F.3d at 138.

about using those types of explosives.  Griffin also requested a copy of the bomb-vest video, and asked that Amawi put together CDs with training materials to facilitate tactics and bomb-making instruction.  Griffin made this request on multiple occasions, and Amawi continually agreed to provide a copy of the video.  Nevertheless, the CDs that Amawi provided never contained a usable copy of the file.[9]  This was despite Griffin's observation that, given Amawi's technical knowledge, transferring the video to Griffin would not have been difficult for Amawi.

According to the government, even absent a successful transfer, the above facts establish that Amawi intended to distribute the information to Griffin so that Griffin could either make a bomb himself or teach others to do so.  Amawi, on the other hand, argues that he did not *distribute* anything and that the failure to transfer is significant evidence that he also lacked the requisite intent, particularly given Amawi's demonstrated acumen in technology.  The government responds by pointing out that translation alone is enough to constitute distribution and that Amawi expressly stated a purpose of compiling training materials.  The government also asserts that the repeated attempts to transfer the materials, though unsuccessful, nonetheless demonstrate intent.

The first question to be addressed is whether Amawi's actions in sharing and translating the video suffice to establish distribution.  Title 18 U.S.C. § 841(n) states that "distribute," for purposes of the chapter that includes 18 U.S.C. § 842, "means sell, issue, give, transfer, or otherwise dispose of."  Title 18 U.S.C. § 842(p)(2)(A), however, broadly prohibits the distribution "by any means" of "information pertaining to, in whole or in part, the manufacture or use of an explosive."  Thus, by its plain language, however, the phrase "by any means" in the applicable subsection facially supports the government's assertion that the statutory definition of distribution includes merely

---

[9]Griffin did not actually obtain a usable copy of the bomb-vest video until El-Hindi provided website information that enabled Griffin to download it himself.

sharing and translating the information at issue, despite the arguably narrower language in § 841(n).**10**

Although Amawi presents a colorable argument showing lack of intent, it is not enough, in order to overturn a jury verdict, simply to offer an alternative explanation of the evidence. *Barnett*, 398 F.3d at 522 ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." (internal quotation marks omitted)).  The question instead is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sliwo*, 620 F.3d at 633 (internal quotation marks omitted).  Here, Amawi was well aware that Griffin sought to compile training materials, and Amawi agreed to help Griffin do so.  Although the issue is close, a reasonable juror could conclude that this endeavor was intended to facilitate the killing or injuring of U.S. nationals abroad.

### 2.  Count 4:  The Arabic Explosives Manual

Count 4 of Amawi's indictment arose from Amawi's distribution to Griffin of a CD that contained a six-page Arabic document that described the process for manufacturing an explosive device.  Amawi asserts that there is no evidence that he intended for Griffin to use the document for any violent purpose.  In particular, Amawi maintains that, in light of the large amount of superfluous information on the CDs, including personal information and a number of videos that would have been of no value to any training operation, a single document relating to explosives cannot evidence an intent to carry out violent acts using the document's instructions.  In response, the

---

**10**The district court reached a similar conclusion in its order denying Amawi's motion to dismiss the charges under Count 3.  Specifically, the district court concluded that

> [g]iving of information "by any means" about making an explosive can occur as effectively from having someone watch a video as by having him read a manual or reciting for him the steps orally.  The statute contains no requirement that the person receiving the information also get an electronic or paper copy.  What matters is giving the proscribed information to someone else.  That's what the indictment charges the defendant did.

R. 655 (Dist. Ct. Order at 6).  In a subsequent order denying Amawi's motion for a judgment of acquittal, the district court similarly concluded (1) that "[s]howing the video sufficed to establish distribution"; and (2) that "[t]he jury could reasonably conclude beyond a reasonable doubt that Amawi showed the video to Griffin intending that Griffin, the former Special Forces soldier, would use the information from the video either to make similar bombs or teach others how to do so."  R. 948 (Dist. Ct. Order at 5–6).

government argues that the purpose of all the materials was to create a training library and that the jury easily could have concluded that Amawi intended eventually to translate the material to permit Griffin to use it for training purposes.

Because this material was actually distributed to Griffin on a disk, the first element of Count 4 is easily met. Thus, the question again comes down to intent. On that point, the district court concluded that because Amawi sought to be trained on "*jihadist* tactics, . . . [t]he jury could reasonably conclude beyond a reasonable doubt that Amawi, himself fluent in Arabic, gave the explosives manual to Griffin in anticipation that Griffin would use the manual during his training of Amawi and the other defendants," and that the manual "had been given to Griffin to enable him to make its information available to Amawi and others, and thereby facilitate their actions against Americans in Iraq." R. 948 (Dist. Ct. Order at 7).

Based on the record, the question of intent is a close one. Amawi transferred various materials to Griffin knowing that Griffin's stated purpose was to use those materials to train others to commit violent jihad against U.S. forces overseas. On the other hand, the other materials that were on the same disk included a random assortment of videos and music, many of which contain no content that could be used to facilitate training. Moreover, the government does not appear to have produced evidence that Amawi necessarily even knew that the manual was on the transferred disk. Nevertheless, given that Amawi and Griffin had multiple discussions concerning gathering materials to provide training to the mujahideen or those seeking to join them, Amawi's subsequent distribution of CDs containing materials relevant to that cause is enough for a rational fact finder to infer his intent to use the materials for that purpose.

## II. THE DISTRICT COURT'S EXCLUSION OF DEFENSE WITNESSES ALTERMAN AND ASLAN

In addition to challenging the sufficiency of the evidence supporting their convictions, the defendants also alleged a number of evidentiary errors relating to the admission or exclusion of certain witnesses. Although I believe that the majority is correct in affirming the district court's decision to admit part of Evan Kohlmann's

testimony, I find troubling the district court's corresponding refusal to permit at least some of the proposed testimony by defense witnesses Jon Alterman and Reza Aslan. Nevertheless, because I do not believe that any resulting error was reversible, I join the majority in affirming the district court's judgment.

The defendants contend that the proffered testimony from Alterman and Aslan would have provided the jury with the knowledge necessary to "consider innocent explanations for Appellants' behavior and statements." Mazloum Br. at 28. Much of this came in the way of background. Alterman, who was the Director and Senior Fellow for the Center for Strategic and International Studies, proposed to testify about typical Middle Eastern views of the United States, as well as the proliferation of religious and political materials in the early 2000s. Specifically, he sought to elucidate the mainstream, non-radical use of certain Arabic terms, such as *ahki* and *Inshallah*. Alterman also would have informed jurors that, although mainstream opinion in Jordan considered the U.S. actions in Iraq to be acts of terrorism, very little material support for the insurgency actually came out of Jordan. Finally, Alterman would have covered certain media developments, including the rise in internet use in the Middle East and the spread of internet videos as a source for those seeking to know more about the developments in Iraq than what was covered in American news media.

Aslan, a religious scholar, fellow at the University of Southern California's Center on Public Diplomacy, and CBS news analyst, also sought to provide what, to a large extent, could be classified as background information, though his testimony would have related to the Islamic faith, the meaning of the term "jihad," and the rise of jihad as a global social movement. In addition, Aslan would have presented the "Social Movement Theory," which "holds that 99.9% of those purporting to imitate a radical stance are really 'free riders' . . . who talk[] the talk, but never walk[] the walk." Mazloum Br. at 36–37; *see also* R. 920-8 (Aslan Proffer at 5–6).

In excluding the two witnesses' testimony, the district court concluded that much of it was "ancillary to the issues in the case" and therefore likely to confuse the jury. R. 754 (Dist. Ct. Op. at 9); *see also id.* at 7. Although the district court recognized that

some of the proposed testimony was of limited probative value in establishing the defendants' states of mind, it found that the tenuous nexus between the defendants and the more generalized observations about Middle Eastern beliefs and attitudes rendered speculative any insights that could be derived. *See, e.g.*, *id.* at 9 (concluding that whether the overwhelming majority of Jordanians who viewed such material failed to act was irrelevant because it "says nothing about whether Amawi himself would have gone, or wanted to go, as the government alleges, to Iraq"). Instead, the district court emphasized the need to focus on what the "defendants did and wanted to do, rather than what others, with whom the defendants had no affiliation, have done, continue to do and want to do." *Id.* at 4.

Federal Rule of Evidence 702 broadly permits testimony by qualified expert witnesses if such "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). But because we review a district court's exclusion of evidence only for abuse of discretion, we will reverse its decision "only if we are firmly convinced of a mistake that affects substantial rights and amounts to more than harmless error." *United States v. Baldwin*, 418 F.3d 575, 579 (6th Cir. 2005) (internal quotation marks omitted); *see also Pressman v. Franklin Nat'l Bank*, 384 F.3d 182, 187 (6th Cir. 2004). In other words, the defendants must show that the proffered but excluded testimony was "likely to have had [a] substantial effect on [the] conviction," which in turn requires us to "consider the relation of the wrongfully admitted (or excluded) evidence to the critical question for the jury, the importance of the evidence, and the closeness of the case." *United States v. White*, 492 F.3d 380, 404 (6th Cir. 2007).

Contrary to the apparent majority position, I believe that Aslan and Alterman sought in part to address issues that are unfamiliar to the average juror and offered evidence that would have provided alternative explanations for the conduct about which Kohlmann testified. This information was relevant and should have been permitted.

Admittedly, much of the proposed evidence was overly broad and may not have been particularly helpful to the jury. For example, the meaning of words like *ahki* and

*Inshallah*—which Alterman proposed to elucidate—is readily apparent from listening to the recordings that were already entered into evidence. Similarly, although the term "jihad" may have engendered some confusion that Aslan's testimony could have cleared up, the parties had already stipulated to the meaning of the term, thereby providing the jury with appropriate guidance concerning the broader definition of the word, which is not limited to violent Islamic warfare. Other evidence, such as broad-based descriptions of the geographic and geo-political conditions and cultural attitudes in the Middle East, was also of limited relevance to the question of the defendants' intent in this case. The district court thus did not abuse its discretion in determining that the rather generic testimony proffered on these subjects either would not have been helpful to the jury or would have risked confusing the issues. *Cf. United States v. Verduzco*, 373 F.3d 1022, 1034 (9th Cir. 2004) (holding that the district court did not err in excluding expert testimony that purported to establish the defendant's mental state "solely by the application of generic cultural and ethnic stereotypes and data").

The district court's decision to exclude other portions of Aslan and Alterman's proposed testimony is more problematic given the unique circumstances of this case. Most troubling is the exclusion of testimony from both witnesses that would have explained the pervasive nature of the videos and websites admitted into evidence and the fact that such materials are commonly viewed by non-extremists in the Middle East. Such facts would likely be unknown to many Midwestern jurors, but they are relevant to those jurors' conclusions regarding the appropriate inference to be drawn from the defendants' frequent viewing of such materials. This is especially so in light of Kohlmann's testimony, which the government offered as evidence of the defendants' intent to support and engage in terrorist activities based in part on the high level of dedication required to monitor and maintain access to these sites. *See* Gov't Br. at 61 (stating that Kohlmann's testimony showed the "extraordinary lengths" to which Amawi and El-Hindi went to access certain websites and indicating that, "[p]articularly when considered in conjunction with [the defendants'] comments as they watched the videos, it demonstrated [the defendants'] intent to support the objectives and activities of such

organizations").**11**  And, as the majority concedes, Kohlmann's testimony concerning these efforts was "quite probative to show [the defendants'] intent as part of the conspiracy."  Majority Op. at 25.

It is true, as the majority points out, that none of the charges directly related to global terrorism, and, to the extent that the defense witnesses sought to enlighten the jury on wide-ranging principles of Islamic or fundamentalist theology or the state of the global jihadist movement, their testimony was not relevant to the factual issues in this case. *Cf. United States v. Rahman*, 189 F.3d 88, 134–35 (2d Cir. 1999) (concluding that generalized testimony about Islam and Islamic law was properly excluded as irrelevant to the question whether the defendant conspired to levy war or commit crimes of violence against the United States).  But even though such charges were absent, Kohlmann's testimony concerning the defendants' access to Al Qaeda-sponsored websites and their dedication to collecting materials that depict deliberate acts of violence against a variety of targets nevertheless raised the specter of global terrorism, and the defendants were entitled to challenge the inference of nefarious intent that may have resulted from Kohlmann's descriptions of the efforts required to obtain such materials.  To some extent, both Aslan and Alterman could have presented that alternate perspective, thereby undermining the government's suggestion that watching and commenting on the videos and websites necessarily evinced the defendants' intent to engage in similar activities.  Furthermore, I do not agree that such evidence, if properly limited, would have risked confusing the jury to such an extent as to outweigh substantially its probative value.  Accordingly, I believe that the district court erred insofar as it excluded defense testimony that could have shed light on the defendants' intent as evidenced by their monitoring and viewing of the websites and videos about which Kohlmann testified.

---

**11**As a general matter, Kohlmann's testimony was limited to providing additional context regarding items already in evidence, including how the websites operated, when certain information was available, and how and why the web addresses for obtaining certain videos changed over time.  The district court sought to cabin any prejudicial effect from Kohlmann's testimony by issuing a cautionary instruction reminding jurors that, in spite of Kohlmann's references to Al-Qaeda and other terrorist groups running the websites from which the defendants obtained their information, no evidence actually linked any defendant to those organizations or supported an inference that the defendants had been in communication with anyone associated with such groups.

The question then becomes whether the exclusion of this evidence substantially prejudiced the defense. In the defendants' favor on this point is the closeness of the case, particularly given the government's heavy reliance on the defendants' repeated viewings of these materials in order to establish their intent to undertake similar action at some point in the future. It is also true, however, that the relatively small portion of the proffered testimony that would have shed light on the issue of intent—e.g., the proposed testimony concerning the number of viewers of these materials in the Middle East as compared to the actual number of individuals who take action on them—does not relate directly to whether the defendants themselves sought to kill or maim U.S. citizens abroad. Nor is it likely that the proposed experts' broad cultural generalizations could have outweighed the highly inflammatory nature of the defendants' statements while viewing various materials. Furthermore, the district court also appropriately recognized that some of the proposed testimony risked not only opening the door to more of Kolhmann's testimony but also incorporating broader issues concerning global terrorism that were not relevant to the issues presented in this trial. Given these legitimate concerns and the relatively limited probative value of the testimony that the defendants sought to have admitted, I cannot conclude that the district court's ultimate balancing of interests with respect to the admissibility of Alterman and Aslan's testimony resulted in reversible error.